**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 10 1997**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

## UNITED STATES COURT OF APPEALS
## TENTH CIRCUIT

RONALD KEITH WILLIAMSON,

      Petitioner-Appellee,

v.

RONALD WARD, Warden, State
Penitentiary at McAlester,

      Respondent-Appellant.

No. 95-7141

---

Appeal from the United States District Court
for the Eastern District of Oklahoma
(D.C. No. CIV-94-539-S)

---

William L. Humes and Robert L. Whittaker, Assistant Attorneys General, (W.A. Drew Edmondson, Attorney General of Oklahoma and Sandra D. Howard, Assistant Attorney General, with them on the briefs), Oklahoma City, Oklahoma, for Respondent-Appellant.

Janet Chesley, Assistant Federal Public Defender (Vicki Ruth Adams Werneke, Assistant Federal Public Defender, with her on the brief), Oklahoma City, Oklahoma, for Petitioner-Appellee.

---

Before **SEYMOUR**, Chief Judge, **TACHA** and **EBEL**, Circuit Judges.

---

**SEYMOUR**, Chief Judge.

---

      Ronald Keith Williamson was convicted in Oklahoma state court of first-

degree murder and sentenced to death. His conviction was affirmed on direct appeal, see Williamson v. State, 812 P.2d 384 (Williamson I), order corrected by, 905 P.2d 1135 (Okla. Crim. App. 1991), cert. denied, 503 U.S. 973 (1992), and his petition for state post-conviction relief was denied, see Williamson v. State, 852 P.2d 167 (Okla. Crim. App. 1993) (Williamson II), cert. denied, 114 S. Ct. 2122 (1994). Mr. Williamson then filed a petition for habeas corpus relief in federal court under 28 U.S.C. § 2254, asserting that he was convicted and sentenced in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. The district court granted relief, ruling that both the conviction and the sentence of death were constitutionally infirm on numerous grounds. Williamson v. Reynolds, 904 F. Supp. 1529 (E.D. Okla. 1995) (Williamson III). On appeal, we agree with the district court that Mr Williamson was denied his Sixth Amendment right to the effective assistance of counsel in two regards and that his conviction must therefore be reversed. However, we also agree with the State that the district court erred in several of its rulings, which we address below in part V in the event of a retrial.

I

The underlying circumstances are as follows. The murder occurred in 1982 in the small town of Ada, Oklahoma. The victim, twenty-one year old Debra Sue Carter, was found dead in her apartment. The door had been broken open and the crime scene showed signs of a struggle. The police found a washcloth forced into Ms. Carter's mouth and a ligature around her neck. The police concluded that Ms. Carter had been sexually assaulted, and suffocated. The police recovered latent fingerprints, hair, and body fluids from the scene, and found a bloody fingerprint on the wall of the bedroom in which the body was located. The only latent prints identified were those of the victim and an Ada police detective who investigated the crime. In a 1983 report, a state fingerprint expert concluded that the bloody print did not match that of the victim or of Mr. Williamson, who was a suspect by that time.

Ms. Carter had worked at the Coachlight Club. The murder took place after she left the Club in the early morning hours of December 8, 1982. Mr. Williamson was known to frequent the Club with Dennis Fritz,[1] and one witness placed Mr. Williamson at the Club the night of the murder.[2] Mr. Williamson was

[1] Mr. Fritz was also charged with first-degree murder. He was tried separately, convicted, and sentenced to life in prison.

[2] Glen Gore testified at Mr. Williamson's preliminary hearing that he saw both the victim and Mr. Williamson at the Club the night of the murder. Mr. Gore stated that the victim told him Mr. Williamson was "bugging" her, and that the victim and Mr. Williamson were talking together around closing time. Mr. Gore refused to testify at Mr. Williamson's trial on Fifth Amendment grounds and his

first interviewed by the authorities in March 1983. He denied any involvement and agreed to provide hair and saliva samples. His mother stated that he was home by 10:00 p.m. the night of the murder. Mr. Williamson was interviewed several additional times in 1983 by both the Ada police and agents from the Oklahoma State Bureau of Investigation (OSBI), and he took two inconclusive polygraph examinations. He continued to assert that he knew nothing about the crime.

From October 1984 through January 1985, Mr. Williamson was incarcerated in the Pontotoc County Jail on an unrelated bad-check charge. In August 1985, Charles W. Amos of the Mental Health Services of Southern Oklahoma determined that Mr. Williamson was not competent to stand trial on this charge, and in September the state district judge in that case ruled him

---

earlier testimony was read to the jury. Mr. Gore's evidence was subject to serious impeachment. At the time of trial, he had been convicted on numerous counts arising from his attack on a young woman and was serving a forty-year sentence as a result of a plea bargain made a week after he was listed as a witness in Mr. Williamson's case. He was admittedly the last person to see the victim alive as she was leaving the Club. One person who saw Mr. Gore with the victim as she was leaving told co-workers that they were arguing and that Mr. Gore had shoved the victim at the end of the encounter. None of this impeachment evidence was presented to the jury. Mr. Williamson asserted in his federal habeas petition that his counsel was ineffective in failing to investigate and impeach Mr. Gore's preliminary hearing testimony, and the district court agreed. Williamson III, 904 F. Supp. at 1549-50. In light of our conclusion that counsel was inadequate in other respects, we need not decide whether the district court's conclusion with respect to Mr. Gore was correct.

incompetent and sent him to Eastern State Hospital. In October, Dr. R.D. Garcia,

Chief Forensic Psychiatrist at Eastern State Hospital, issued an opinion stating

that Mr. Williamson was competent and returned him for trial. In February 1986,

Terri Holland, who had been incarcerated in the Pontotoc County Jail while Mr.

Williamson was held there a year earlier, informed the District Attorney that she

had heard Mr. Williamson confess to the murder when they were in jail together.[3]

On May 1, 1987, the victim's body was exhumed and another set of her

fingerprints was obtained. The state fingerprint expert then changed his opinion

and concluded that the bloody print found on the bedroom matched that of the

victim. Mr. Williamson was arrested on May 8. On May 9, after being held in

---

[3] Ms. Holland testified to that effect during trial. Her testimony was also subject to impeachment. During this same period of incarceration, Ms. Holland allegedly heard another inmate confess to a different murder. She brought this information to the attention of the authorities immediately and testified against that defendant in January 1985. Around that date, she also pled guilty to her third felony, received a light sentence, had three years of it suspended, and was ordered to pay restitution of $50 a month. By the time of Mr. Williamson's trial in 1988, she had made only one payment. In 1986, she was again in trouble over writing bad checks and worked out a restitution agreement in lieu of being charged. Mr. Williamson asserted in his federal habeas petition that his trial counsel was ineffective in failing to investigate and bring to the jury's attention Ms. Holland's part in the trial of the other inmate, and the similarities between her conduct in that case and the lenient treatment she received on those charges, and her actions in the present case and the lenient treatment she received from the prosecuting authorities on her more recent problems. The district court agreed. Williamson III, 904 F. Supp. at 1550-51. As with the testimony of Mr. Gore, see n.3 supra, we need not review this ruling in view of our conclusion that counsel was ineffective in other respects.

the Pontotoc County Jail for twenty-four hours, Mr. Williamson gave a statement to Agent Gary Rogers of the OSBI describing a dream in which he had committed the murder. Mr. Williamson also related the contents of a similar dream to a Pontotoc County jailor on May 22. Neither of these statements was recorded. In September 1987, another man, Ricky Jo Simmons, confessed to killing Ms. Carter in a statement that was videotaped by police. Mr. Williamson was tried and convicted in April 1988.

Mr. Williamson was represented by appointed counsel W.B. Ward, a sole practitioner who was an experienced criminal attorney. Mr. Ward moved the court for additional counsel, citing "the seriousness of the charges against Defendant and the complexity and time consuming nature of the case." Rec. vol. IV, no. 1 at 23. Although the court granted this motion, co-counsel withdrew as attorney for Mr. Williamson three weeks before trial because he had accepted appointment as an assistant district attorney.

The record reveals that Mr. Ward found representing Mr. Williamson demanding and difficult. At his preliminary hearing, Mr. Williamson became abusive and violent, overturning counsel table and threatening his co-defendant. He was physically restrained and the hearing ultimately proceeded without his presence. Mr. Ward's motion to withdraw as counsel was denied. Mr. Ward, who is blind, subsequently stated by affidavit:

Because of my previous experiences with Mr. Williamson I had expected some trouble [during trial], and consequently I arranged to have my son sit behind him during the trial with instructions to bring him to the ground if he made any sudden move toward me. On the whole I found my representation of Mr. Williamson to be an extremely unpleasant experience and I was glad to get this case over with.

Rec. vol. XXII, doc. 31, ex. 1 at 2.[4]

At one point in attempting to obtain witness names from the State, Mr. Ward stated to the state trial court:

If the Court please, we're not trying a man that's charged with running a stop sign, he's charged with the most serious offense covered by the statutes of the State of Oklahoma. I'm a court-appointed lawyer, as you well know. I don't intend to . . . spend any more time than is necessary on this, but I also intend to do a proper job of it.

Rec. vol. VI at 6. Mr. Ward subsequently stated at a motion hearing: "Judge, I've got to make a living. I can't spend all my time on this case." Rec. vol. VIII at 12. Records reveal that Mr. Ward spent twenty-one and one-half hours preparing for the preliminary hearing, thirty-two hours at the preliminary hearing, fourteen hours on trial motions, forty-three and one-half hours preparing for trial and forty-five hours in trial, for which he was paid the maximum fee provided by law, $3200. Rec. vol. IV, no. 3 at 369.

---

[4] Mr. Ward's affidavit, from which the quotes in this opinion are taken, was part of the state court record in Mr. Williamson's direct appeal. The same affidavit was presented to the federal district court.

Mr. Williamson has consistently argued in both state and federal court that he was deprived of his right to the effective assistance of counsel in numerous respects. We address only two of Mr. Williamson's contentions, his assertion that Mr. Ward was incompetent in failing to investigate and make use of his history of mental problems, and his assertion that Mr. Ward was incompetent in failing to investigate and present to the jury Ricky Simmons' confession. Because we conclude the district court was correct in ruling that counsel's actions on these two matters violated Mr. Williamson's Sixth Amendment rights, we do not reach the remaining arguments on appeal.

II

Before we deal with the merits of these issues, we address two preliminary matters. We turn first to the question of the applicability of the habeas corpus amendments enacted as Title I of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214.[5] These provisions were signed

---

[5] The new Act amended existing habeas provisions in 28 U.S.C. §§ 2244, 2253, 2254, and 2255. In addition, the Act created special habeas corpus procedures, to be codified at 28 U.S.C. §§ 2261-2266, applicable to capital cases in qualifying states. Pub. L. No. 104-132, §§ 2261-66, 110 Stat. 1221-26 (1996). The State here has conceded in a supplemental brief that it is not a qualifying state for purposes of the newly created capital procedures.

into law on April 24, 1996.  Mr. Williamson filed his petition for federal habeas corpus relief September 22, 1994.  The district court decision was filed September 19, 1995, and the notice of appeal was filed October 16, 1995, all before the new amendments were enacted.  In Edens v. Hannigan, 87 F.3d 1109 (10th Cir. 1996), we considered a claim on federal habeas that a petitioner had been denied his Sixth Amendment right to counsel in a virtually identical time-frame.  We there held that the new law does not apply under these circumstances.  Id. at 1112 n.1.  That holding governs here.[6]

Second, we address the State's argument that the district court erred in failing to presume correct the state court fact-findings, and in accepting as true affidavits offered by Mr. Williamson without holding an evidentiary hearing.  As the State recognizes, however, a claim of ineffective counsel is a mixed question of fact and law, Strickland v. Washington, 466 U.S. 668, 698 (1984), which a federal habeas court reviews de novo, Miles v. Dorsey, 61 F.3d 1459, 1474 (10th Cir. 1995), cert. denied, 116 S. Ct. 743 (1996).  The court is required, of course, to presume correct the "'basic, primary, or historical facts: facts in the sense of a

---

[6] We note, however, that our analysis and decision would be the same under the new provisions as well.  See, e.g., Reid v. Oklahoma, 101 F.3d 628, 629 n.2 (10th Cir. 1996) (noting that result would be the same under either version of habeas corpus provisions); United States v. Hernandez, 94 F.3d 606, 612 n.4 (10th Cir. 1996) (same); Earnest v. Dorsey, 87 F.3d 1123, 1127 n.1 (10th Cir.) (same), cert. denied, 117 S. Ct. 527 (1996).

recital of external events and the credibility of their narrators.'" Thompson v.

Keohane, 116 S. Ct. 457, 464 (1995) (quoting Townsend v. Sain, 372 U.S. 293,

309 n.6 (1963) (internal quotation omitted)).  This is true under the former habeas

provisions as well as the new ones.[7]  Nonetheless, as we discuss in detail below,

we agree with the district court that the state court determination on the

competency of counsel was undermined by factual assertions that are contradicted

by the State's own evidence.  See, e.g., Williamson III, 904 F. Supp. at 1538 n.4,

1557.  Finally, we point out that after Mr. Williamson had submitted the affidavits

the State now alleges it was not given the opportunity to rebut, the State argued to

the district court that "[t]here is absolutely no need for an evidentiary hearing on

any issue."  Rec. vol. XXXII at 103.  The State did not offer counter-affidavits

below, nor did it argue that in light of Mr. Williamson's submissions an

evidentiary hearing had become necessary.  Even on appeal the State does not

_____

[7] Under the old habeas corpus provisions, "a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction . . . shall be presumed to be correct" unless one of eight enumerated circumstances is established.  28 U.S.C. § 2254(d) (1994).  Under the new Act, section 2254 is amended to provide that the writ shall not be granted "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . . resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 104, 110 Stat. 1218-19 (to be codified at 28 U.S.C. § 2254(d)(2)).  The new Act further provides that "a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  Id. (to be codified at 28 U.S.C. § 2254(e)(1)).

identify which of Mr. Williamson's affidavits it believes are subject to challenge or why, or set out the evidence it wants to present at a hearing. Accordingly, we conclude that the district court did not act improperly in relying on the uncontroverted affidavits, to the extent that it did so.

III

In his federal habeas petition, Mr. Williamson argued that his right to competent counsel was denied during the guilt phase of his trial by, inter alia, Mr. Ward's failure to investigate and use the evidence of Mr. Williamson's mental illness.

> The right to counsel is a fundamental right of criminal defendants; it assures the fairness, and thus the legitimacy, of our adversarial process. The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect.

Kimmelman v. Morrison, 477 U.S. 365, 374 (1986) (citation omitted). Evaluating the effectiveness of counsel's assistance requires a two-part inquiry. "In order to prevail, the defendant must show both that counsel's representation fell below an objective standard of reasonableness, and that there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Id. at 375 (citing Strickland, 466 U.S. at

688, 694.

> There is a strong presumption that counsel's performance falls within the wide range of professional assistance, the defendant bears the burden of proving that counsel's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy. The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential.

Id. at 381 (internal quotation omitted) (citing Strickland, 466 U.S. at 688-89).

The district court here held that Mr. Ward's failure to adequately investigate Mr. Williamson's mental illness both created a reasonable probability that he was tried while incompetent and left counsel unprepared to challenge the dream confessions. Williamson III, 904 F. Supp. at 1542, 1545. The duty to investigate derives from counsel's basic function, which is "'to make the adversarial testing process work in the particular case.'" Kimmelman, 477 U.S. at 384 (quoting Strickland, 466 U.S. at 690). "Because that testing process generally will not function properly unless defense counsel has done some investigation into the prosecution's case and into various defense strategies, [the Supreme Court has] noted that 'counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" Id. (quoting Strickland, 466 U.S. at 691). In assessing counsel's conduct, we are mindful of the Supreme Court's observation that "[o]ur duty to search for constitutional error with painstaking care is never

-12-

more exacting than it is in a capital case." Burger v. Kemp, 483 U.S. 776, 785 (1987); see also Kyles v. Whitley, 115 S. Ct. 1555, 1560 & n.1 (1995). In addition, we have pointed out that in a capital case, counsel's duty to investigate all reasonable lines of defense is strictly observed. Coleman v. Brown, 802 F.2d 1227, 1233-34 (10th Cir. 1986), cert. denied, 482 U.S. 909 (1987).

The history of Mr. Williamson's mental problems is extensive. The district court set it out in detail and we will highlight it here. In December 1979, Mr. Williamson was admitted to Saint Anthony Hospital in Oklahoma City upon referral by vocational rehabilitation personnel in Ada. A report from M.P. Prosser, M.D., prepared as a result of Mr. Williamson's stay there, stated:

> Actually this boy has demonstrated rather bizarre and sometimes psychopathic behavior whether he is maniac [sic] as the counselor in Ada thought or a schizoid individual with sociopathic trends, or the reverse, sociopathic individual with schizoid trends may never be determined. . . .
>
> This boy has lived in a dream since early adolescence when he demonstrated rather remarkable skill in the baseball area. He has always wanted to be a big-time player and a pro, has almost made the pro training teams on occasion, has never been able to be accepted and make the big leagues and still thinks that they are going to come for him or accept him or somehow make him famous. This is the real schizophrenic part of his disorder. Long term treatment may be required but he does not feel he needs treatment for schizophrenia, he just wants to get in the ballgame and preferrably [sic] as one of the stars.

Rec. vol. XXII, doc. 31, ex. 3.

In November 1981, he was admitted to Central State Hospital in Norman,

-13-

Oklahoma, where his history of drug and alcohol abuse was noted, he was diagnosed with dysthymic disorder,[8] and he was prescribed chemotherapy and given a fair prognosis. Id. ex. 4. In June 1983, he was evaluated at Mental Health Services of Southern Oklahoma (Valley Hope Association), diagnosed with alcohol dependence and schizophrenic disorder, and given a guarded prognosis. Id. ex. 5. In August of that year, he was given a psychological evaluation at Vocational Rehabilitative Services in Pontotoc County by a psychological assistant and diagnosed with bipolar disorder,[9] alcoholism and drug dependence (in remission), a paranoid personality disorder, and borderline personality disorder. Id. ex. 6.

In August 1985, Mr. Williamson was referred by the court to Charles W. Amos of the Mental Health Services of Southern Oklahoma for a psychological evaluation to determine whether he was competent to stand trial on the bad-check charge. Mr. Amos determined that Mr. Williamson was not competent and recommended that he be sent to Eastern State Hospital for inpatient observation and evaluation. Mr. Amos, who had seen Mr. Williamson previously, stated that

---

[8] Dysthymia is a mood disorder, "less severe than a major depression, marked by [despondency and] loss of interest in activities, . . . and lasting more than two years." 1 J.E. SCHMIDT, M.D., ATTORNEYS' DICTIONARY OF MEDICINE D-171 (1996).

[9] Bipolar disorder is a mood disorder marked by alternating manic and depressive episodes. 1 J.E. SCHMIDT, M.D., ATTORNEYS' DICTIONARY OF MEDICINE B-76 (1996).

Mr. Williamson showed "a marked deterioration of emotional function since our last encounter in 1982," and that Mr. Williamson was "most likely delusional at this time." Rec. vol. XXIX, app. J, no. 6. The court found Mr. Williamson incompetent on the basis of Mr. Amos' report, "previous testimony, and the Court's in court observation of defendant." Id. no. 7. After a stay at Eastern State, Dr. Garcia determined that Mr. Williamson was competent and he was returned for trial. Nonetheless, his discharge summary stated that he was a sociopath who must continue to take 100 mg. of thorazine four times a day. Id. no. 8.

From October 1986 to January 27, 1987, after his release from prison on the bad-check conviction, Mr. Williamson was seen at the Mental Health Services of Southern Oklahoma by Marie T. Snow, M.D., a psychiatrist, and Norma Walker, a social worker. He was diagnosed with atypical bipolar illness and prescribed lithium carbonate, navane, and artane. Id. no. 9. The record contains three significant letters written by Ms. Walker. The first, written on January 27, 1987, stated the Mr. Williamson had been stable on lithium until the middle of December 1986, when he had stopped taking the drug for religious reasons. She further stated that "[w]ithout meds, he is belligerent, abusive, physically violent, has religious delusions and a thought disorder." Id. On July 16, 1987, Ms. Walker wrote a letter to Mr. Williamson's attorney, Mr. Ward, summarizing his

history of behavior and treatment. The letter closed with the following paragraph.

> This client has been suspected by each counselor who saw him of shamming, malingering, attempting to manipulate the system. The known abuse of alcohol and drugs complicates the picture. There may be neurological damage, or organic brain syndrome. Or the client may know how to feign thought disorder. As an outpatient facility we are not equipped to rule out those conditions. He needs a complete neurological evaluation and observation by experienced professionals in an inpatient facility. This is the only way to obtain a differential diagnosis in this case, in my opinion.

Rec. vol. XXII, doc. 31, ex. 1B.[10]

On October 21, 1987, Ms. Walker wrote a letter to whom it may concern, apparently addressing a disability benefits determination. This letter is set out in its entirety below.

> I last saw Ron Williamson on February 20, 1987, and he was not capable of managing his daily living activities. He was greatly impaired in his ability to make reasonable life decisions. He was disoriented to time, was impaired in attention span, abstract thinking and level of consciousness. He was at times delusional, also showing an associational disturbance and confused thinking. He showed very poor judgment and was not taking care of his own needs for food and shelter.
> He was unmedicated at that time, and refused to take medication. Even when he had been on medication, he was quite unrealistic in his expectations of how others would act. His perceptions of reality were seriously distorted.
> He would be unable to care for himself without being

---

[10] In the voluminous records of Mr. Williamson's treatment history, we have found only one written indication that any mental health professional who saw him felt he was shamming. In 1983, a substance abuse counselor expressed a belief that, if pressured, Mr. Williamson might "jump to insanity to perpetuate his dependent existence." See rec. vol. XXIX, app. J, no.5.

medicated, and would be hard to manage, even with medication. From my experience, I expect him to need long-term institutionalization for his diminished mental capacities and unmanageable behavior.

Id. ex. 11.

On November 9, 1987, Mr. Williamson was awarded disability benefits under the Social Security Act. In granting benefits, the Administrative Law Judge relied on many of the medical records described above to conclude that Mr. Williamson was suffering from severe bipolar disorder, personality disorder and substance abuse disorder, and that his mental illness had rendered him disabled on or before March 31, 1985. Rec. vol. XXIX, app. J, no. 13. The ALJ stated:

> His perception of reality is seriously distorted. He apparently has a history of unmanageable behavior, and it is expected that he will need long term institutionalization for his diminished mental capacities. It is noted that he would likely be hard to manage even with medication. There are repeated episodes of disorientation to time, impaired attention span, as well as impaired abstract thinking and level of consciousness. He is at times delusional, also showing an associational disturbance and confused thinking.

Id. The record also contains affidavits from members of Mr. Williamson's family describing his history of mental problems.

Counsel for Mr. Williamson made no use of this history of mental problems. Mr. Ward did not move the court for a competency determination, nor did he suggest at trial that Mr. Williamson's dream confessions were not credible because they were the delusional product of Mr. Williamson's mental illness. In

an affidavit, Mr. Ward stated that he "had become aware of some of Mr. Williamson's psychiatric history" prior to trial. Rec. vol. XXX, app. K, no. 6, ex. 1. Nonetheless, the only documentation Mr. Ward collected regarding his client's psychiatric history was the October 1985 letter from Dr. Garcia stating that Mr. Williamson was competent to stand trial at that time, the July 1987 letter from Ms. Walker quoted above, and a psychological report prepared by Claudette S. Ray, M.S., of the Pontotoc County Health Department. Id. Ms. Ray's report, dated October 5, 1987, evaluated Mr. Williamson while he was incarcerated at the county jail on the murder charge. Rec. vol. XXII, doc. 31, ex. 1C. Ms. Ray concluded that Mr. Williamson possessed "sufficient skills to meet the ordinary demands of daily life, including personal care, social interaction, job performance, and money management." Id. However, Ms. Ray closed with the following observation: "He may behave inappropriately, such as not attending preliminary hearings which would benefit him, because of his panic and confused thinking. Most individuals would be demanding to hear information and opinions that would influence their future life or death." Id.

Mr. Ward gave the following reasons for limiting his investigation to the above three documents.

> Since Mr. Williamson had already been found mentally competent in [the 1985 case], I did not feel that it was worthwhile to pursue a pretrial mental competency examination in the present case. Further, that since none of the mental health professionals that I was

aware of had stated that Mr. Williamson did not know right from wrong, I saw no reason to further develop the issue of Mr. Williamson's mental health regarding either an insanity defense, or as mitigation for punishment. <u>I am a solo practitioner with a staff of only one secretary.  As such I do not have the resources for extensive investigation.</u>

<u>Id.</u> ex. 1 (emphasis added).

The Supreme Court has declared that counsel's strategic decisions based on limited investigation

> <u>are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.</u>  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

<u>Strickland</u>, 466 U.S. at 691 (emphasis added).

Based on this record, and in light of governing Supreme Court authority, we agree with the district court that Mr. Ward did not exercise reasonable professional judgment in deciding to limit his investigation of his client's mental condition to the three documents described above, and to rely solely on Dr. Garcia's letter in deciding not to request a competency determination.[11]  "'[T]he

---

[11] The State relies heavily on <u>Miles v. Dorsey</u>, 61 F.3d 1459 (10th Cir. 1995), <u>cert. denied</u>, 116 S. Ct. 743 (1996), in arguing that counsel's failure to investigate was reasonable in this case.  That case is factually distinguishable and indeed emphasizes that the reasonableness inquiry requires a case-by-case determination.  <u>Id.</u> at 1475-77.  In <u>Miles</u>, counsel had obtained a recent evaluation of a clinical psychologist who found no thought disorders, as well as a prior

-19-

criminal trial of an incompetent defendant violates due process.'" <u>Cooper v. Oklahoma</u>, 116 S. Ct. 1373, 1376 (1996) (quoting <u>Medina v. California</u>, 505 U.S. 437, 453 (1992).

> "Competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without penalty for doing so."

<u>Id.</u> (quoting <u>Drope v. Missouri</u>, 420 U.S. 162, 171-72 (1975)). "The test for incompetence is also well-settled. A defendant may not be put to trial unless he 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding . . . [and] a rational as well as factual understanding of the proceeding against him.'" <u>Id.</u> at 1377 (quoting <u>Dusky v. United States</u>, 362 U.S. 402, 402 (1960) (per curiam)). Here the existing circumstances clearly created doubt about Mr. Williamson's competence sufficient to render counsel's decision not to pursue the matter professionally unreasonable.

Dr. Garcia's opinion on Mr. Williamson's competency was provided two years before the period with which we are concerned. Moreover, a court had

---

forensic evaluation that found substantial indications of shamming but likewise found no psychosis. <u>Id.</u> at 1475. Moreover, counsel's client there did not demonstrate the bizarre behavior we have described above. We believe the instant case is closer factually to the cases that the court in <u>Miles</u> concluded were both distinguishable and illustrative of the need to assess the issue in light of all the circumstances. <u>Id.</u> at 1476 & n.14.

previously found Mr. Williamson incompetent and had sent him to Eastern State Hospital for observation and treatment. Mr. Ward was aware from Ms. Walker's letter that she recommended Mr. Williamson be given a complete neurological evaluation and observation by experienced professionals in an inpatient facility. Mr. Ward was also aware that Mr. Williamson had been awarded disability benefits on the basis of his mental condition during his pretrial incarceration, although Mr. Ward did not obtain a copy of the award decision sent to Mr. Williamson at the Pontotoc County Jail. The report from Ms. Ray indicated that Mr. Williamson's mental state might cause him to inappropriately choose not to attend his preliminary hearings.

Indeed, Mr. Ward's own observations and experiences while representing Mr. Williamson were objective indications that Mr. Williamson's competency was open to serious question. Mr. Ward stated:

> I had significant difficulties in dealing with Mr. Williamson. Mr. Williamson behaved well enough when I visited him at the jail, although I did hear stories from the jailers about incidents of unusual behavior. However his conduct at court appearances was atrocious and unpredictable. At virtually every appearance there was some kind of outburst from Mr. Williamson. . . . At the preliminary hearing Mr. Williamson became so incensed that he turned a table over on my secretary and Greg Saunders, counsel for Dennis Fritz. At that point Mr. Williamson had to be removed from the courtroom. The preliminary hearing lasted for several days and the magistrate gave Mr. Williamson more than one opportunity to return to the proceedings, but Mr. Williamson always refused. As a result he missed the entire preliminary hearing. . . . [A]t the jury trial he continued to be disruptive. He argued with the prosecutor and the

-21-

witnesses in front of the jury, and made a poor argumentative witness.

. . . .

      I was aware that Mr. Williamson was receiving medication in the Pontotoc County Jail, and was receiving the medicine through Dr. Marie T. Snow, a local psychiatrist associated with Mental Health Services of Southern Oklahoma. . . . Early on in my representation of Mr. Williamson I became concerned that he was being over medicated because he appeared to be too drowsy on occasions when I would attempt to interview him. As a result of this problem I requested that Mr. Williamson's dosage be reduced. Dr. Snow is an elderly lady, and is the only psychiatrist in Ada. I did not find her to be very communicative regarding Mr. Williamson's mental condition. I never had a formal interview with her regarding Williamson, nor did I subpoena her for the trial or any hearing. However on one occasion she did tell me not to let the jailers lock me in the cell with Mr. Williamson.

Rec. vol. XXII, doc. 31, ex. 1.

We are convinced that these observations of Mr. Williamson's demeanor before and during the court proceedings, coupled with the scant documentary evidence of Mr. Williamson's mental condition that Mr. Ward did obtain, would have prompted a reasonable attorney in a capital case to investigate further before deciding to forego a competency determination. Mr. Ward knew of his client's history of mental problems, knew that he was being medicated, perhaps over-medicated, observed his client's bizarre behavior, knew that he had previously been determined incompetent, and knew that he had been awarded disability benefits on the basis of his mental condition. "An attorney has expanded duties when representing a client whose condition prevents him from exercising proper

-22-

judgment." Thompson v. Wainwright, 787 F.2d 1447, 1451-52 (11th Cir. 1986)

(citing Code of Professional Responsibility of Florida Bar, FLA. STAT. ANN. §

EC7-12 (West 1983), cert denied, 481 U.S. 1042 (1987). Indeed, the evidence of

which Mr. Ward was aware triggered not only a duty to investigate further, but

also his duty to seek a competency hearing to determine whether Mr. Williamson

was mentally able to consult with his attorney and aid in his defense with a

reasonable degree of rational understanding. Counsel's failure to do so is both

unreasonable and difficult to understand.[12] Accord Antwine v. Delo, 54 F.3d

1357, 1367-68 (8th Cir. 1995) (holding counsel ineffective in failing to

investigate fully before rejecting strategies based on client's mental condition),

cert. denied, 116 S. Ct. 753 (1996); Kenley v. Armontrout, 937 F.2d 1298, 1304-

08 (8th Cir.) (same), cert. denied, 502 U.S. 964 (1991); Bouchillon v. Collins, 907

F.2d 589, 597 (5th Cir. 1990) ("It must be a very rare circumstance indeed where

a decision not to investigate would be 'reasonable' after counsel has notice of the

client's history of mental problems."); cf. Jones v. Page, 76 F.3d 831, 842-43 (7th

Cir.) (limited inquiry into client's mental state not ineffective assistance where

---

[12] Under Oklahoma law, competency examination procedures are completely at state expense. OKLA. STAT. tit. 22, § 1176 (1991); see generally id. at §§ 1175.2-1176. Moreover, requesting a competency hearing would not have required a significant investment of time by counsel. Mr. Ward did not defend his failure to pursue the issue of competency as a matter of strategy, and we can see no strategic advantage to be gained by his decision.

-23-

client's behavior gave no reason to question competency), cert. denied, 117 S. Ct. 363 (1996); Miles v. Dorsey, 61 F.3d 1459, 1476 (10th Cir. 1995), cert. denied, 116 S. Ct. 743 (1996) (same).

Having concluded that counsel's performance in not pursuing a competency determination fell below an objective standard of reasonableness, we turn to the second prong of the Strickland inquiry and assess whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

Had Mr. Ward investigated his client's history of mental problems and sought information about his mental state either from the mental health professionals who had treated him or from his family, Mr. Ward would have discovered significant evidence casting doubt upon the validity of Dr. Garcia's 1985 opinion that Mr. Williamson was competent. Most significantly, at the time Dr. Garcia rendered that opinion, it appears that Dr. Garcia, who died in 1986, was himself suffering from severe untreated bipolar disorder. See rec. vol. XXX, app. L. The record contains affidavits to that effect from mental health professionals who worked with Dr. Garcia and from a state Inspector General for the Oklahoma Department of Mental Health who received complaints about Dr. Garcia's bizarre conduct. The record also contains an affidavit from Dr. Philip J.

-24-

Murphy, a clinical psychologist, who reviewed Dr. Garcia's personal medical history and his history of patient evaluations at Eastern State Hospital after Dr. Garcia's death. Dr. Murphy stated that, in his expert opinion, Dr. Garcia's "illness, in its manic form, was severe enough to affect Dr. Garcia's treatment of his patients and to impair and distort his diagnostic judgment." Id. Dr. Murphy concluded:

> In summary, it is my opinion that because of the distorting influence of Dr. Garcia's mental illness on his perceptions and his judgments, neither Dr. Garcia's evaluations of Mr. Coleman's condition nor his opinion about Mr. Coleman's competency to stand trial should have formed the basis of a determination of Mr. Coleman's competency in 1979.

Id.

In addition, further investigation by Mr. Ward would have uncovered the opinion granting Mr. Williamson disability benefits on the basis of his mental illness as of March 1985, several months before Dr. Garcia's opinion was rendered. Mr. Ward would have discovered the other letters from Ms. Walker describing Mr. Williamson's delusional thinking, as well as the extensive history of his mental problems and treatment. There is a reasonable probability that had Mr. Ward been in possession of the information that a more thorough investigation would have revealed, he would not have relied upon Dr. Garcia's letter in deciding against requesting a competency hearing.

In order to show prejudice, however, Mr. Williamson must show a

-25-

reasonable probability that the outcome would have been different.  Strickland,
466 U.S. at 694.  We agree with the court in Bouchillon that, "[w]ith respect to
the prejudice prong of a claim of ineffective assistance of counsel, [a petitioner]
need only demonstrate a 'reasonable probability' that he was incompetent,
'sufficient to undermine confidence in the outcome.'" Bouchillon, 907 F.2d at 595
(quoting Strickland, 466 U.S. at 694).  In our view, the evidence of Mr.
Williamson's mental state which we have recited at length throughout this opinion
establishes a reasonable probability that he was not competent to stand trial.  Mr.
Ward's lack of investigation created a substantial risk that his client's due process
rights were violated by standing trial while incompetent, and therefore
undermines our confidence in the reliability of the adversarial testing process.

Mr. Ward's failure to investigate his client's mental illness also left him
unprepared to challenge the credibility of Mr. Williamson's dream confessions.
Mr. Williamson related his dream of committing the murder first to Agent Rogers
on May 9, 1987, after he had been incarcerated for twenty-four hours, and again
to a jailor on May 22.  The jail medication log does not indicate that Mr.
Williamson received medication for his mental illness before June 10, 1987.  See
rec. vol. XXII, doc. 31, ex. 12.  Ms. Walker's letter of October 21, 1987, indicates
that Mr. Williamson had been unmedicated since before February 20, 1987, and
was refusing medication as of that date.  Id. ex. 11.  Mr. Amos, Ms. Walker, and

the disability benefits opinion all stated that Mr. Williamson had a distorted perception of reality and was delusional, particularly when he was not taking medication.  Id.; rec. vol. XXIX, app. J, no. 6; id. no. 13.

While a defendant's mental condition of itself cannot justify the suppression of his confession absent evidence of police coercion, see Colorado v. Connelly, 479 U.S. 157, 167 (1986), evidence of a defendant's mental state can be used to impeach the credibility of a confession once admitted.  We have already determined that counsel's failure to investigate Mr. Williamson's history of mental illness was not professionally reasonable and rendered counsel's decision to forego a competency hearing ineffective.  In addition, Mr. Ward's failure to uncover evidence that Mr. Williamson's mental illness distorted his perception of reality and caused delusions deprived counsel of a potent weapon with which to challenge the State's most direct evidence.  Aside from Mr. Williamson's confession, the case against him consisted primarily of the testimony of Mr. Gore, see supra note 3, the testimony of Ms. Holland, see supra note 4, and the fact that four of the many hairs found at the murder scene were "consistent with" those of Mr. Williamson.[13]  This evidence was largely circumstantial and hardly

---

[13] The district court extensively discussed the reliability of hair analysis and ruled that it was inadmissible.  See Williamson v. Reynolds, 904 F. Supp. 1529, 1554-58 (E.D. Okla. 1995).  Although we do not review the merits of the court's ruling, we note that some of the authorities it cited view hair analysis as highly subjective and unreliable.  It is undisputed that hair analysis, unlike fingerprint

overwhelming. Thus, Mr. Williamson's dream confessions were likely given great weight by the jury, which was unaware that Mr. Williamson was mentally ill with a disorder that distorted reality and produced delusions. Counsel's failure to discover and use this evidence to discredit the dream confessions undermines our confidence in the outcome of the proceedings, particularly when considered together with counsel's failure to bring before the jury evidence that another man had confessed to the crime, as we discuss below.

In reaching this conclusion, we acknowledge the deference to be accorded state court findings of historical fact under 28 U.S.C. § 2254(d) (1994). Such findings "shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear" that one of eight circumstances exist. Id. Under the eighth exception, the presumption does not apply if the state court's "factual determination is not fairly supported by the record." Id. § 2254(d)(8).

Here, the state court's treatment of counsel's failure to investigate was based on an inaccurate characterization of the record. In addressing whether the failure fell below an objective standard of reasonableness, the court stated that counsel had three opinions from mental health professionals that Mr. Williamson was competent and a malingerer. See id. at 413. In fact, only Ms. Walker's letter

identification and DNA analysis, is not conclusive. As in the instant case, the most that hair analysts are willing to state is that hair samples are "consistent with" each other and "could have" come from the same source.

referred to Mr. Williamson's possible shamming, and in that same letter she stated that her facility was not equipped to assess whether Mr. Williamson was in fact malingering, and that he needed to be evaluated by experienced professionals in an inpatient facility. We likewise cannot find adequate support for the court's statement that "[c]ounsel was well aware of Appellant's past and present mental condition." Id. at 413. While Mr. Ward was, of course, aware of his client's bizarre behavior, he did not know that this behavior was the manifestation of severe mental illness that produced delusions and a distorted perception of reality.

The state court's treatment of the prejudice prong is similarly troublesome. The court stated that all the affidavits but one in Mr. Williamson's history of treatment described him as competent. See id. at 414. However, only Dr. Garcia's letter addressed competency as such, and that opinion would clearly have been subject to challenge upon investigation. We conclude, contrary to the state court, that no significance can be given to the possibility that further investigation would have allowed the prosecution to use the reference to Mr. Williamson's malingering. There is but a single reference made in 1983 at Ms. Walker's facility to support her statement that Mr. Williamson might be shamming. This reference would itself have to be evaluated in light of Ms. Walker's statement that her facility was not equipped to evaluate the possibility of shamming. Moreover,

"[w]e presume . . . that it is unusual for even the most artful malingerer to feign incompetence successfully for a period of time while under professional care." Cooper, 116 S. Ct. at 1382. The state court also did not take into account the disability determination. Because the state court's treatment of ineffectiveness in general was based on an incomplete view of the record, we do not accord its fact findings on the issue any deference. See 28 U.S.C. § 2254(d)(8) (1994) (presumption of correctness need not be accorded when state court "factual determination is not fairly supported by the record").[14]

IV

The district court also concluded that counsel was ineffective in failing to investigate and present to the jury the fact that another man, Ricky Simmons, had confessed to the murder. Mr. Ward stated by affidavit that:

> Prior to trial the prosecution made available to me and Greg Saunders, trial counsel for Dennis Fritz, the co-defendant, a video tape of one Ricky Simmons. . . . In this tape Mr. Simmons makes a confused confession to the murder of Debra Carter, the victim in this

---

[14] Similarly, under section 2254(d) as amended, we conclude that the state court's resolution of the ineffectiveness claim as it relates to counsel's failure to investigate his client's mental condition "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Pub. L. No. 104-132, § 104, 110 Stat. 1218-19 (to be codified at 28 U.S.C. § 2254(d)(2)).

-30-

case. I did not attempt to introduce this tape, or the fact of Mr. Simmon's [sic] confession into evidence at trial, and I cannot remember why I did not do so. Upon reflection, I think that I should had [sic] attempted to do so because Simmon's confession was as believable as Mr. Williamson's.

Rec. vol. XXII, doc. 31, ex. 1. The jury was never informed that Mr. Simmons had confessed to the crime.

The trial transcript reveals that when Mr. Ward first made reference to the Simmons tape, the prosecutor objected on the ground that the tape was made at a polygraph examination. Rec. vol. XV at 486. In fact, as the state court recognized, the tape "does not reflect that it was made at a polygraph examination." Williamson I, 812 P.2d at 412. Counsel's failure to investigate the circumstances surrounding the Simmons confession left him unprepared to challenge the prosecution's erroneous objection and thus unable to present the jury with this confession which he himself recognized was as believable as that of his client.

The state court nonetheless concluded that Mr. Williamson "was not prejudiced by the absence of the confession as introducing the confession would have allowed the State the opportunity to present evidence that Ricky Simmons had been excluded as a suspect based upon the results of hair analysis." Id. However, the state court's finding that hair analysis eliminated Mr. Simmons as a suspect is contradicted by the record. The hair analysis report prepared by the

-31-

state's expert in April 1988, just prior to the trial in this case, reveals that the expert did not compare Ricky Simmons' hair samples with <u>unidentified</u> hairs retrieved from the crime scene. Instead, the expert compared Mr. Simmons' hair with six hairs already determined to be consistent with that of co-defendant Dennis Fritz and one hair already determined to be consistent with that of Mr. Williamson. <u>See</u> rec. vol. XXIX, app. G. An analysis that compared Mr. Simmons' hair with hair already determined to be consistent with samples from someone else but failed to compare Mr. Simmons' hair to unidentified hairs could not eliminate Mr. Simmons as a suspect in the case.[15]

We conclude that counsel's failure to investigate the circumstances surrounding Mr. Simmons' confession left counsel unprepared to obtain the confession's admission at trial and fell below an objective standard of professional reasonableness. We further conclude a reasonable probability exists that the outcome of the trial would have been different if the jury had been able to consider another confession to the crime that was as convincing as that of Mr. Williamson. Our confidence in the outcome of this trial has been undermined by

---

[15] The prosecution relied on the same flawed analysis to argue at trial that Glen Gore had been eliminated as a suspect. <u>See</u> rec. vol. XV at 736. In fact, the hair expert compared samples from Mr. Gore with hairs already determined to be consistent with those of the victim, Mr. Fritz, and Mr. Williamson, but not compare Mr. Gore's samples with unidentified hairs. <u>See</u> rec. vol. XXIX, app. G. Mr. Williamson's counsel did not challenge the validity of the hair comparison evidence on this ground.

counsel's treatment of the Simmons statement, particularly when viewed together with counsel's failure to challenge the credibility of his client's confession.

In so holding, we, like the Fifth Circuit, "are not insensitive to the hardships imposed on appointed counsel who work with little or no compensation under difficult conditions. It is very often a thankless undertaking. Nevertheless, there is a duty to investigate which cannot be abridged because counsel is only appointed, not retained." Bouchillon, 907 F.2d at 597. We also point out that while the representation of this capital defendant was constitutionally ineffective in some respects, much of the fault lies with the state system under which Mr. Ward was forced to operate.

Mr. Ward is a sole practitioner. After his appointed co-counsel withdrew from the case shortly before trial, Mr. Ward did not request a replacement and was left to carry on alone.[16] Moreover, Mr. Ward did not receive investigative or expert services.[17] Finally, at the time of trial in 1988 the statutory maximum fee, which Mr. Ward received, was $3200. Okla. Stat. tit. 21, § 701.14 (Supp. 1985). These factors make it economically unattractive, if not impossible in many

---

[16] We note Congress has provided that a defendant in a federal capital case is entitled upon request to the appointment of two counsel, at least one of which "shall be learned in the law applicable to capital cases." See 18 U.S.C. § 3005 (1994); United States v. McCullah, 76 F.3d 1087, 1097-98 (10th Cir. 1996).

[17] Congress has also provided funds in federal death penalty cases for investigative and expert services. See 21 U.S.C. § 848(q)(4) (1994).

circumstances, for appointed counsel to expend the time and effort required to adequately represent a client in a capital case.[18]

In sum, we agree with the district court that Mr. Williamson is entitled to a new trial, both on the ground that his counsel was ineffective in failing to pursue a competency determination and on the ground that counsel's failure to conduct pretrial investigation precluded him from properly dealing with the confessions at trial.

V

The state has questioned many of the other conclusions reached by the district court. We address only three of these briefly because they may well arise in the event of a retrial.

The state argues that the district court applied the wrong standard in ruling that the hair analysis evidence was inadmissible. We agree. When the admission

---

[18] Since Mr. Williamson's trial, the Supreme Court of Oklahoma has acknowledged this dilemma. In State v. Lynch, 796 P.2d 1150, 1153-54 (Okla. 1990), the court held that, as applied, the statutory scheme for compensating appointed counsel was unconstitutional under the State constitution because it was so confiscatory it could amount to an improper taking of private property. Lynch mandated that appointed counsel receive an hourly rate tied to that of prosecutors and public defenders plus an average hourly rate for overhead. Id. at 1161-62. Congress has likewise refused to impose a maximum fee in federal capital cases. See 21 U.S.C. § 848(q)(4) (1994).

of evidence in a state trial is challenged on federal habeas, the question is whether the error, if any, was so grossly prejudicial that it fatally infected the trial and denied the fundamental fairness that is the essence of due process. See, e.g., Maes v. Thomas, 46 F.3d 979, 987 (10th Cir. 1995). See also Carlson v. State, 945 F.2d 1026, 1029 (8th Cir. 1991) (admissibility of hair evidence). This assessment requires examining both the reliability of the evidence and the significance it had at trial. The district court here, however, did not perform its analysis under a due process/fundamental fairness standard. Instead, it incorrectly assessed the issue in evidentiary terms under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). Because the court employed the wrong standard, we reverse its ruling that the hair analysis was inadmissible. That evidentiary determination is properly left to the state court in the event of a retrial.

The state also contends the district court was incorrect in holding that the trial court erred in instructing the jury regarding the need for a unanimous verdict. We agree. Mr. Williamson was charged with two alternative counts of first degree murder: murder with malice aforethought and felony murder. Although the trial court instructed the jury that its verdict had to be unanimous, the court did not explain that the verdict had to be unanimous on one count or the other, and the verdict form likewise did not distinguish between the two alternative

-35-

counts. The district court held that because the instructions and the verdict form left open the possibility that the jury may not have unanimously agreed on which of the alternative counts was applicable, Mr. Williamson was deprived of his constitutional right to a unanimous verdict. The district court's determination is foreclosed by Schad v. Arizona, 501 U.S. 624, 645 (1991). Although that case was a plurality opinion, Justice Scalia wrote a separate concurrence agreeing with the result reached by the plurality and rejecting the argument adopted by the district court here. Id. at 648-51.

Finally, we turn to the state's argument that the district court erred in ruling Mr. Williamson's due process rights were violated when, in accordance with state law, the jury was allowed to consider evidence of unadjudicated crimes in considering the death penalty. The district court's holding is directly contrary to our decision in Hatch v. Oklahoma, 58 F.3d 1447, 1465 (10th Cir. 1995), in which this court concluded that "consideration of evidence of unadjudicated crimes in imposing the death sentence does not violate a petitioner's due process rights."

VI

In conclusion, we hold that counsel was constitutionally inadequate in failing to fully investigate Mr. Williamson's history of mental illness, failing to

seek a competency determination, failing to challenge the credibility of his client's confession, and failing to investigate and present to the jury the fact that another man had confessed to the crime.  Because Mr. Williamson was prejudiced by counsel's ineffectiveness, he is entitled to relief.  Accordingly, we **AFFIRM** the ruling of the district court directing that Mr. Williamson be granted a new trial within 120 days or permanently released from custody.