**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 31 2000**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

CYNTHIA BUTLER HORTON,

Petitioner-Appellant,

v.

NEVILLE MASSIE; ATTORNEY
GENERAL OF THE STATE OF
OKLAHOMA,

Respondents-Appellees.

No. 99-7052
(D.C. No. 96-CV-36-B)
(E.D. Okla.)

**ORDER AND JUDGMENT** *

Before **BRISCOE** , **BARRETT** , and **ANDERSON,** Circuit Judges.

After examining the briefs and appellate record, this panel has determined

unanimously that oral argument would not materially assist the determination of

this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is

therefore ordered submitted without oral argument.

---

* This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Petitioner Cynthia Butler Horton appeals pro se from the denial of her habeas corpus petition brought pursuant to 28 U.S.C. § 2254.[1] We issued a certificate of probable cause on the issue of ineffective assistance of counsel and ordered briefing by the State.

Petitioner was convicted in 1988 on one count of first degree, malice aforethought murder and one count of kidnapping arising out of the death on July 4, 1987, of Abe Opela. The State requested the death penalty, but the jury did not find the requisite aggravating circumstances that "the murder was especially heinous, atrocious, or cruel" or that it was committed "for the purpose of avoiding or preventing a lawful arrest or prosecution." R. Vol. XIV, at 107. Petitioner argues that she was denied effective assistance of counsel at trial for three reasons: counsel failed to (1) call as witnesses her daughter, Maream, (who petitioner claims was an eyewitness to the murder) and the psychologist who interviewed Maream; (2) conduct an investigation that would have resulted in evidence to impeach the witnesses testifying against her; and (3) request an instruction on duress. The district court did not conduct an evidentiary hearing, relying instead on the state court record before it. We therefore review the legal

---

[1] Because petitioner filed her habeas petition before April 24, 1996, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 do not apply to her appeal. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997).

and factual bases for the district court's dismissal of the petition de novo. *See*

*Tyler v. Nelson*, 163 F.3d 1222, 1226-27 (10th Cir. 1999).

In examining whether petitioner's counsel was ineffective, we use the

standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). The

petitioner initially must show that counsel's presumptively effective performance

was not reasonably effective, *see id.* at 688, under the particular facts and

circumstances of the case, *see Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986).

Petitioner must also show that the deficient performance prejudiced her defense.

*See Strickland*, 466 U.S. at 687.

> Prejudice exists if it is shown that there is a reasonable probability
> that, but for counsel's unprofessional errors, the result of the
> proceeding would have been different. A reasonable probability is a
> probability sufficient to undermine confidence in the outcome.
>
> . . . .
>
> In making this determination, a court hearing an ineffectiveness claim must
> consider the totality of the evidence before the judge or jury. Some of the
> factual findings will have been unaffected by the errors, and factual
> findings that were affected will have been affected in different ways. Some
> errors will have had a pervasive effect on the inferences to be drawn from
> the evidence, altering the entire evidentiary picture, and some will have had
> an isolated, trivial effect. Moreover, a verdict or conclusion only weakly
> supported by the record is more likely to have been affected by errors than
> one with overwhelming record support. Taking the unaffected findings as a
> given, and taking due account of the effect of the errors on the remaining
> findings, a court making the prejudice inquiry must ask if the defendant has
> met the burden of showing that the decision reached would reasonably
> likely have been different absent the errors.

*Id.* at 694-96. It is appropriate for us to consider counsel's overall performance to determine if the alleged omissions overcome the presumption that counsel rendered reasonably professional assistance, *see Kimmelman*, 477 U.S. at 386, but some individual errors are so serious and prejudicial that, by themselves, they may be sufficient to establish ineffective assistance of counsel and reversible error, *see id.* at 383.

## I. Procedural history and background facts.

**A. Undisputed facts**. Petitioner, Walter Barrowman, and Mike Horton (hereinafter "Horton") were jointly charged with Opela's kidnapping and murder, but Barrowman and Horton requested and received separate trials. When Barrowman testified at petitioner's trial, he had plea bargained his testimony against petitioner in exchange for the dropping of robbery charges. He had spent most of his time in jail sharing a cell with Horton. Horton's first trial ended in a hung jury, and in his second he was acquitted. Without objection from petitioner's counsel, the prosecution elicited the fact that Barrowman had already been convicted of murder as an accomplice in the case (but had not been sentenced). *See* R. Vol. VIII, Tab 8 at 1.

As presented to the jury, this case was a "swearing match" between petitioner and the State's two key witnesses, Barrowman and Nancy Rozell. The following facts were undisputed at trial. At the time of the murder, petitioner

lived in Prague, Oklahoma. She was married as a matter of convenience to Horton, who had a reputation for violence. Petitioner had a 3½-year-old daughter, Maream, and a baby son from a former marriage, and had asked Horton to protect her and her children from her ex-husband. Barrowman lived in Seminole, Oklahoma, and was Horton's close friend and drinking buddy. Horton had recently moved in with Linda Swanson (who also lived in Seminole), and had been sexually involved with Nancy Rozell, a friend of petitioner. Melanie Henson was Rozell's close friend and petitioner's acquaintance. Theresa Conyer was petitioner's duplex neighbor.

On the night of the murder, Opela, Horton, Barrowman, Rozell, Henson, petitioner, and a few other people were drinking in Conyer's backyard. Neither Opela, Horton, Barrowman, nor Rozell had a car. Opela, who had just cashed his paycheck and had shown the money to Horton, became extremely drunk. During the evening, Horton became aggressive towards Opela. He held a knife under Opela's neck and threatened to kill him, spit whiskey in his face, kicked him, threw water on him and made him drink more whiskey, and knocked him out of a chair and onto the ground. After Opela refused to pay a one-dollar bet that Horton made with him, Horton flew into a rage, threatened to kill Opela with a broken whiskey bottle, then went into petitioner's house and began kicking furniture and breaking things. He stated he wanted to "roll" Opela for his money.

Petitioner testified that Horton told Barrowman to go get Opela's money, *see* R. Vol. X, Tab 10 at 97, and Rozell testified that she saw Barrowman looking in Opela's pockets as Opela was lying asleep on the ground in the backyard, *see id.* Vol. IX, Tab 9 at 12-13.

Petitioner and Barrowman carried Opela to petitioner's car, stating that they were going to take Opela home. Horton also got into petitioner's car, and told Rozell to take care of petitioner's children. Henson stayed with Rozell.

Petitioner drove to a cemetery in Prague, where everyone got out of the car. She knocked Opela down after he called her a name, and Barrowman took Opela's money. They left him at the cemetery, but after driving away Horton stated that they were either going to have to give Opela's money back or kill him. [2] The three returned to petitioner's house. Petitioner went inside, told Rozell and Henson about the robbery, and asked Rozell to stay with her children while they took Opela to another place. [3] Petitioner, Barrowman, and Horton then drove back to

[2]     Petitioner's testimony varies with Barrowman's as to when Horton made the statement. She testified that Horton did not suggest killing Opela until after they retrieved him from the cemetery. In his first recorded statement to police, Barrowman testified that after they left the cemetery the first time, they "all three got to talking about it, said well, we ought to go get him and give him back his money." R. Vol. II, Tab 8, Ex. A (attached to Respondent's Resp. to Pet. for writ of habeas corpus) (first Barrowman statement of July 9, 1987 at 12:39 a.m., Ex. 21 to petitioner's direct appeal brief). Petitioner's counsel did not impeach him with this statement.

[3]     Petitioner testified that she told them she was taking Opela home; Rozell

(continued...)

the cemetery, picked up Opela, and began driving toward Seminole, which is eighteen miles from Prague.

**B. Petitioner's story**. At this point, petitioner's, Barrowman's, and Rozell's testimonies diverge. Petitioner testified that, after picking Opela up at the cemetery, Horton directed her to drive towards Seminole and that Barrowman mentioned stopping at his apartment so he could get his work clothes. She testified that Opela began rambling that the three had robbed him and Horton stated that if Opela did not shut up, "he was gonna have to kill him." R. Vol. X, Tab 10 at 114. She testified that when they got to Seminole, Horton went into Barrowman's apartment and came back out with a gun, and she became afraid that Horton was really going to harm Opela. She stated that she decided to stop at Doyle's Quik Stop, south of Seminole, in order to get Horton away from Opela, and she told Barrowman and Horton to go inside and get something to eat while she got gas. Horton took the gun inside the store. Petitioner then drove away without the two men and took Opela back to her house in Prague. She testified that, on the way, she talked Opela into not going to the police about the robbery if she got his money back. Petitioner was not sure whether Henson was still there when she arrived, but she talked to Rozell. *See id.* at 215. She said she left

---

[3](...continued)
and Henson testified that she told them they were taking him to a remote location to leave him.

Opela asleep on her couch and returned to Seminole to pick up the other two men. When petitioner returned to Doyle's Quik Stop over an hour later, Horton and Barrowman were gone. [4] She looked for them at Barrowman's apartment and at Linda Swanson's house, but Swanson had not seen the men. Swanson accompanied her to look for them, and they spotted the two men walking along the highway and picked them up. Petitioner then took Swanson home, stopped by a convenience store to pick up more beer, and stopped by Barrowman's apartment to pick up his work clothes.

According to petitioner, the men agreed to return Opela's money to him, so she drove them back to her home in Prague. Henson had left, [5] but Rozell was still there. Petitioner testified that Horton refused to give Opela back his money, and when petitioner stated she was taking Opela home, Horton pulled the gun from his boot and said "we were all going for a ride." *Id.* at 131. Petitioner testified that

---

[4] The clerk at Doyle's Quik Stop testified that Doyle's is about three miles south of Seminole. He stated that Horton and Barrowman came in the store sometime after 12:30 or 1:00 a.m. and stayed there about thirty minutes. Petitioner came in sometime after 3:00 a.m., he thought, and asked him if he had seen them. *See* R. Vol. VI, Tab 6 at 168-73. Barrowman testified that the men had walked about a mile, stopping occasionally, before petitioner picked them up, *see id.*, Vol. VIII, Tab 8 at 96-97, and Swanson testified that the men were a mile-and-one-half to two miles from Doyle's when petitioner picked them up, *see id.*, Vol. VII, Tab 7 at 6.

[5] Henson testified that she left at 2:45 a.m.; Rozell said Henson left at 2:00 a.m., just minutes before petitioner, Horton, and Barrowman returned at 2:10 a.m.

she told Horton she did not want to go, but Horton pointed the gun in her direction and told her to get her children out of bed. She stated that she "knew better than to refuse to go." *Id.* at 132. According to petitioner, the five adults and two children then got into petitioner's car, with the women and children in front and the men in back. Horton directed petitioner to drive back toward Seminole, and they pulled off onto a side road and stopped when Opela said he needed to relieve himself. Petitioner testified that the adults all got out of the car, and Horton shot Opela. After everyone got back in the car, Horton threatened that if petitioner said anything, "it would be me, too." *Id.* at 138. They all then returned to petitioner's home in Prague.

**C. Barrowman's story**. Barrowman testified that, after they picked up Opela at the cemetery, they drove to Seminole and petitioner stated she needed to use the bathroom at his apartment. He stated that she went into the locked apartment alone without using a key, as his apartment door could be opened when locked by bumping it, but that he did not see her come out with anything. She then drove to Doyle's Quik Stop, told him and Horton to go inside, and said that she would be back in a minute. After waiting for about thirty minutes, the two men decided to walk back towards Seminole, and had walked a mile or so when petitioner and Swanson picked them up. They took Swanson home, went by a convenience store to buy some beer, and then dropped by Barrowman's apartment

-9-

to get his work clothes. Barrowman testified that he kept his pistols in the bottom part of a gun cabinet next to his bed. He testified that he went up to his apartment alone, and he was getting his clothes when petitioner walked in and told him "she put it back." R. Vol. VIII, Tab 8 at 27. When he asked what she was talking about, she told him she had put back his gun, and when he asked her what she was doing with it, she said, "I thought I might need it." *Id.* at 28. Barrowman testified that they returned to Prague, and after Horton went to bed, petitioner said, "I shot him," and that she had fired the gun four times. *Id.* at 31, 33. He stated he was sure Rozell heard petitioner confess because Rozell was in the same room, and petitioner and Rozell sat down and began talking about the specifics of the murder. He testified that petitioner told him not to tell Horton that she had shot Opela.

Barrowman testified that the next day he went to his apartment and checked his gun, which was in his gun cabinet, and found four empty shells. He threw the shells away in three different places. Later that day he told Horton only that he thought his gun had been fired. *See id.* at 43. He testified that Horton suggested that Barrowman give the gun to Swanson to keep, and Horton put it in Swanson's purse.

On cross examination, petitioner's counsel asked if Barrowman had told police that petitioner had told him she put the gun under his pillow. Barrowman

said he could not recall, but that sometimes he kept a gun under his pillow. On redirect, Barrowman changed his testimony to state that he found the gun under his pillow or blankets, instead of in the gun cabinet. In response to the prosecutor's leading question, he also changed his testimony about Horton's statement about killing Opela to "*you're* gonna have to give his money back or kill him" *see id.* at 133 (emphasis added), instead of "*we're* going to have to give his money back or kill him," *see id.* at 16 (emphasis added). Barrowman testified that he was "staggering drunk" the night of the murder, *id.* at 140, and that several times during the course of events he had either blacked out or fallen asleep.

**D. Rozell's story**. Rozell testified that after petitioner, Horton, and Barrowman returned to petitioner's house the second time, Horton immediately went to bed. Petitioner and Barrowman stayed up, whispering and laughing, but Rozell didn't know what they were talking about or what they had done with Opela. She testified that she got up around ten or eleven o'clock the next morning, woke up petitioner, and that while they were cooking breakfast, petitioner told her she had killed Opela. She said petitioner told her she had shot Opela three times but had fired the gun four times. She also testified that petitioner told her she had dropped Barrowman and Horton off at Doyle's Quik Stop before she went to Barrowman's apartment and to get his gun. Rozell gave a

very detailed description of Opela's death, including the specifics that petitioner stopped the car on the second curve of the road because Opela had to relieve himself, that petitioner left the car running while she killed Opela, and the exact words both petitioner and Opela allegedly said before petitioner murdered him. She testified that petitioner told her that Barrowman knew about her killing Opela, but not to tell Horton or the police.

Rozell testified that on the afternoon of July 5, petitioner took her and petitioner's children out to where Opela's body was lying, and again told her not to tell Horton or the police. On July 7, Rozell went to the police, told them that petitioner had killed Opela, and took the police to the location of Opela's body. At first, Rozell stated that she lied to police the first two times they interviewed her because she thought she "was gonna get in trouble for something I didn't do" and because petitioner had taken her to the police station and was waiting for her. R. Vol. IX, Tab 9 at 40. On cross-examination, she said she lied because she was afraid of petitioner.

## II. Discussion

**A. Failure to call Maream and the psychologist as witnesses**. Because Barrowman was indicted for Opela's murder along with petitioner, credible testimony corroborating his claim that petitioner murdered Opela was essential to the State's case. *See* Okla. Stat. tit 22, § 742 ("A conviction cannot be had upon

the testimony of an accomplice unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.").  Testing the credibility of the State's witnesses, therefore, was of crucial importance to petitioner's defense, as was presenting any corroborating testimony that supported petitioner's assertion that Horton murdered Opela and that she had driven Opela to the murder scene only under duress.

Petitioner asserts that Maream (nicknamed Mimi), who was three and one-half at the time of the murder, witnessed the murder and could have testified that she saw Horton shoot Opela and that both Barrowman and Rozell were at the scene of the murder.  On March 7, 1988, about two weeks before trial, psychologist Gerald Ball interviewed Maream when she was four years two months old and wrote in his process notes the following colloquy describing the incident:

"We was in a car on a dirt road driving."  Who was in the car?  "Mama, Jamal, me, Ugly Man, Mike, Nancy, Walter.  We were sitting in front seat so Ugly Man wouldn't get me.  Ugly Man got killed on a dirt road and he fell in a ditch.  Mike killed him.  Mike and Ugly Man were fighting.  Happened with a gun.  Then we went back home.  Mama cried when Ugly Man got killed."

R. Vol. II, Tab 8 Ex. A (attached to Respondent's Resp. to Pet. for writ of habeas corpus), March 7, 1988 Process Note of Gerald Ball (Ex. 36 to petitioner's brief

-13-

on direct appeal). Ball stated in his notes that Maream's "affect was pleasant and confident. Memory intact. Recalls having come here once before and being scared to talk to a stranger." *Id.*[6] On March 9, petitioner's counsel moved the court to order that Maream's testimony be taken by videotape deposition for use in petitioner's trial, relying as legal authority on an Oklahoma statute that applies to child victims of crimes. *See* R. Vol. XIV at 67. Counsel argued that Maream would be traumatized by having to testify in "a packed courtroom, in full view of her mother who could not speak to her or touch her." *Id.* The court denied the motion on March 14, stating that the statute cited by counsel did not apply to the situation. *See id.* at 72. Counsel did not renew the motion, nor did he call Maream live as a witness at trial.

---

[6] Ball wrote a subsequent letter stating that he again interviewed Maream on May 14, 1990, at which time "she told me the same basic memory. I ask[ed] her where her mother was when the ugly man was being shot, and she replied, 'She was standing right by the car where I could see her and she didn't have no gun.' I have no reason to doubt the truthfulness of Maream's story or the accuracy of her memory." R. Vol. II, Tab 8 Ex. D (attached to Respondent's Resp. to Pet. for writ of habeas corpus), May 14, 1990 Letter (unnumbered exhibit to petitioner's pro se state application for habeas corpus). When Maream was interviewed by the county sheriff on December 7, 1990, her memory was essentially the same, except that when questioned about the placement of individuals in the car, she described where everyone was sitting. When asked, she stated that she had called Opela "ugly man" because Horton had hit Opela in the face with a gun while they were still in the car. *See id.*, Ex. A, Dec. 7, 1990 interview by Sheriff Charles Sisco (Ex. 6 of petitioner's direct appeal brief). Petitioner asserts that the autopsy report shows that Opela had been hit in the face.

-14-

Under Oklahoma law, a child witness is competent to testify when it is demonstrated that the child knows what it means to tell the truth, has taken an oath, and has personal knowledge concerning the event. *See Davis v. State*, 647 P.2d 450, 451 (Okla. Crim. App. 1982). It is not unusual for courts to find even very young children competent to testify. *See, e.g., Hawkins v. State*, 891 P.2d 586, 594 (Okla. Crim. App. 1994) (affirming finding of competency of five year old who witnessed events when she was four because child responded that she knew right from wrong and stated that if she did something wrong she would "get a spanking," and who promised she would only tell what was "right" and not what was "wrong"); *Dunham v. State*, 762 P.2d 969, 971-72 (Okla. Crim. App. 1988) (affirming finding of competency even though four-year-old child showed some confusion because he "affirmatively recognized that he would be punished for making up stories"); *cf. Carter v. State*, 738 A.2d 871, 872-73 (Md. 1999) (affirming court's decision to clear courtroom when allowing fourteen-year-old girl to testify about sexual abuse that allegedly started when she was three).

Petitioner's counsel not only did not call Maream as a witness, he also failed even to request the court to interview her and make a competency finding. Respondent does not address counsel's failure to call Maream as a live witness other than to argue that it was a reasonable trial strategy because Maream could have been easily impeached. Respondent points to evidence that, in 1990 when

Sheriff Sisco interviewed her, Maream could not recall certain facts like when the crime occurred, who was living in her home at that time, whose car she was in when she witnessed the murder, or whether she had ever seen the victim before the crime. We fail to see the relation between a potential loss of memory regarding facts (some of which a 3½-year-old child may never have even known) sought to be elicited two and one-half years after the trial and Maream's competency to testify at the time of the trial to the simple and material facts that she saw Horton shoot Opela, that Barrowman and Rozell were there, and that her mother cried when Horton shot Opela. Maream's testimony as to these basic facts has never wavered, according to the psychologist and officer who interviewed her, and petitioner has submitted Maream's affidavit stating that she still remembers the events that occurred the night of the murder.

Respondent further argues that it was a wise tactical decision because Maream's credibility was suspect due to her relationship to petitioner. Petitioner has presented an affidavit showing that, if the prosecution had accused Maream of recently fabricating the story to help her mother, Maream's grandmother was ready to testify that Maream had first told her that Horton shot Opela when the grandmother was explaining to Maream why petitioner was in jail and could not come home, soon after petitioner was arrested. *See* R. Vol. II, Tab 8 Ex. D (attached to Respondent's Resp. to Pet. for writ of habeas corpus), Aff. of Lois

-16-

Butler (unnumbered exhibit to petitioner's pro se state application for habeas corpus).  Oklahoma also allows experts to testify concerning their impressions of a child's truthfulness when the child's credibility has been attacked, and Mr. Ball apparently was willing and ready to do so.  *See Dunham*, 762 P.2d at 973 (noting that expert properly testified "that four-year-olds generally could not tell a lie consistently").

The federal district court found that counsel's decision not to call Maream was a reasonable tactical decision and that petitioner had "failed to demonstrate that [Maream's and the psychologist's] testimony would have resulted in her acquittal."  R. Vol. XIII, Doc. 30 at 18.  This finding cannot be upheld for two reasons.  First, the court used an improper standard by which to measure prejudice.  Petitioner was required not to establish that Maream's testimony *would* have resulted in her acquittal, but only that there was a "reasonable probability" that it would have done so.  *Strickland*, 466 U.S. at 694.

Second, because the court did not hold an evidentiary hearing, the record does not show whether counsel's decision not to call Maream was based on a tactical decision, or on a misunderstanding of the law, or perhaps even upon a belief that the State's case was so weak that he should not put the child through the trauma of testifying at trial.  We need not remand for an evidentiary hearing,

however, because the record demonstrates that whatever counsel's reasoning was, his performance was ineffective as a matter of law.

Given that this was a capital murder case with the death penalty requested, that there were no other witnesses who could corroborate petitioner's testimony and impeach Barrowman's and Rozell's testimonies regarding who shot Opela and where they were at the time of the murder, and that petitioner had admittedly been involved in Opela's robbery before he was murdered and therefore had an apparent motive to kill him, we conclude that failing to call Maream at trial constituted ineffective performance.

We must now examine the strength of the State's case to determine whether counsel's failure, weighed against the totality of the prosecution's evidence, undermines our confidence in the jury's verdict. *See id.* We begin by noting that there was no direct or circumstantial evidence that petitioner killed Opela other than Barrowman's and Rozell's testimony that she told them she did.

The prosecution's case was considerably weakened by inconsistencies between Barrowman's and Rozell's testimony as to when petitioner allegedly confessed to Rozell and when petitioner allegedly got the gun. There were also inconsistencies between the testimony of these two key witnesses and that of other State witnesses. For example, Rozell testified that she knew where Opela's body was located only because petitioner took her out to see it on July 5. Rozell

stated that petitioner was standing outside the car while Rozell was on her knees beside the car, looking for shoes under the seat, and that petitioner's children were with them. She admitted that she had testified before that Maream was standing up in the back seat. *See* R. Vol. IX, Tab 9 at 91-92. She said she heard a truck go by while she was on her knees by the car. *See id.* at 30. Guy Hutchison testified that he drove by the car on July 5 and saw a lady on her knees beside the car, looking for something. After he passed, in his rear view mirror he thought he saw the head of another woman inside the car, but he did not see any children. On cross-examination he admitted that in September 1987 at petitioner's preliminary hearing, he testified that he had not seen a person other than the lady on her knees. *See* R. Vol. VIII, Tab 8 at 143-150. [7] Thus, Hutchison's testimony was inconsistent with Rozell's claim that petitioner was

---

[7] Hutchison told police in a statement during the murder investigation in July 1987 that he saw the woman on her knees beside the car on July 4, but "didn't see anything else or anyone else as he was watching the road because of the curve he was approaching." Crime Report at 13, attached as unnumbered exhibit to petitioner's application for habeas relief. Counsel for petitioner apparently did not obtain the statement or report and did not impeach Hutchison with this prior statement. At the preliminary hearing, Hutchison testified in response to a leading question by the prosecutor that he had an "impression" when he first looked that there *might* have been somebody else there, but as far as he knew for sure, there was only one person. R. Vol. II, Tab 8 Ex. D (attached to Respondent's Resp. to Pet. for writ of habeas corpus), Tr. of preliminary hearing (unnumbered exhibit to petitioner's brief).

standing there outside the car when Hutchison passed by and that petitioner's children were also there, standing on the seat in plain view.

Petitioner denied taking Rozell out to the murder scene and testified that Rozell had borrowed her car on the afternoon of July 5. Hutchison's testimony was consistent with petitioner's claim that Rozell knew where the body was because she witnessed the murder and that Rozell must have gone back by herself or with someone else when she borrowed the car.

Rozell testified that petitioner, Horton, and Barrowman initially left the house with Opela and were gone for about thirty minutes. She testified that everyone except Opela returned from Seminole the second time (after the murder) around 2:10 a.m. Theresa Conyers testified that Barrowman picked up Opela from her back yard after midnight but before 1:00 a.m., saying he was going to take Opela home. *See* R. Vol. VI, Tab 6 at 59-60. Melanie Henson testified that petitioner returned from the Czech cemetery at around 1:00 a.m. and that she passed petitioner's car on the road near Prague after 2:45 a.m. Swanson and Barrowman testified that they definitely were still at Swanson's house in Seminole at 2:00 a.m. The clerk at Doyle's Quik Stop thought that petitioner came in looking for Barrowman and Horton sometime after 3:00 a.m. Thus, Rozell's testimony regarding what time it was when petitioner, Horton, and Barrowman finally returned to Prague was inconsistent with every other witness's

testimony and was also inconsistent with the amount of time necessary for petitioner to commit the murder as described by Barrowman. [8]

Everyone who testified about the time period between when petitioner left the men at Doyle's Quik Stop and when she returned to get them stated that she was gone at least one hour. There was uncontroverted evidence that it took only twenty-four minutes to drive from Doyle's Quik Stop to the site of Opela's murder and back. *See* R. Vol. X, Tab 10 at 249. In fact, in his second statement to police, Barrowman stated that petitioner was gone so long that he thought she had driven Opela back to Prague (which is exactly what petitioner claimed she had done). *See* R. Vol. II, Tab 8 Ex. A (attached to Respondent's Resp. to Pet. for writ of habeas corpus), Barrowman statement on July 9, 1987 at 10:22 a.m. (Ex. 22 to petitioner's direct appeal brief). Curiously, petitioner's counsel did not impeach Barrowman with this statement at trial. Nevertheless, Barrowman's testimony regarding the time period was inconsistent with his claim that petitioner drove Opela to the murder site, killed him, and then returned to pick up the men.

Petitioner has demonstrated that both of the State's key witnesses had motivation to lie and accuse petitioner of the murder. The jury struggled with

---

[8] In his first recorded statement to police, Barrowman testified that it was "three [a.m.] or after" when he, petitioner, and Horton returned to petitioner's house in Prague. R. Vol. II, Tab 8 Ex. A (attached to Respondent's Resp. to Pet. for writ of habeas corpus), Barrowman statement given July 9, 1987 at 12:39 a.m. (Ex. 21 to petitioner's direct appeal brief).

Rozell's and petitioner's testimony, requesting "to see or hear the alleged admission to the Prague Police and would also like to hear the tape of Nancy and Cindy." R. Vol. XI, Tab 11 at 117. Because Rozell's taped statement had not been admitted into evidence, the court instructed the jury to rely on its collective memory. *See id.* at 119. In closing argument, the prosecutor focused on petitioner's failure to corroborate her story, stating that "[t]here appears to be only one eyewitness . . . that verifies [petitioner's story], and that's her," and then noting that neither Barrowman nor Rozell corroborated her story. *Id.* at 68.

Under these facts, we believe that Maream's testimony that both Barrowman and Rozell were actually at the murder scene and that she witnessed Horton shoot Opela would have drastically altered the evidentiary picture before the jury, and that their decision "would reasonably likely have been different absent the error" of failing to call her and Ball as witnesses. *Strickland*, 466 U.S. at 696.

**B. Failure to investigate**. Petitioner argues that her counsel was ineffective when he failed to investigate and impeach the testimony of the State's witnesses. Petitioner submitted affidavits showing that if counsel had investigated, he could have proved that Melanie Henson's claim that she saw Barrowman and Horton in petitioner's car when she passed the car in the dark, going fifty miles an hour around a curve, was impossible. *See* R. Vol. II, Tab 8

Ex. A (attached to Respondent's Resp. to Pet. for writ of habeas corpus), Aff. of Prague Police Chief Luttrell (Ex. 20 to petitioner's direct appeal brief).

If counsel had interviewed one of Rozell's friends, Tammy Molsbee, about Rozell's conduct after the murder, he would have discovered that Molsbee saw Rozell alone in petitioner's borrowed car on the afternoon of Sunday, July 5, and followed Rozell, at Rozell's request, to petitioner's apartment. *See id.*, Tammy Molsbee sworn statement (Ex. 4 to petitioner's direct appeal brief). This impeached Rozell's testimony and corroborated petitioner's testimony that she did not take Rozell to the murder site and that Rozell had borrowed her car.

If counsel had interviewed Molsbee's mother, he would have discovered that, on July 7 Rozell told Mrs. Molsbee that petitioner confessed to killing Opela the night of the murder (contrary to her trial testimony that petitioner confessed the next day) and also told Mrs. Molsbee that petitioner had taken her to the scene of the murder on Saturday, July 4, which would have impeached Rozell's testimony at trial that petitioner took her out there on Sunday, July 5. *See id.*, Peggy Molsbee Aff. (Ex. 3 to petitioner's direct appeal brief).

If counsel had interviewed Barrowman's apartment manager and maintenance man and checked Barrowman's apartment door itself, he would have discovered that Barrowman's locked door could not have been "bumped" open without the key, as Barrowman testified, thus impeaching his testimony of how

-23-

petitioner allegedly got his gun. *See id.,* Ron Palmer Aff. (Ex. 16A, B to petitioner's direct appeal brief).

She also presented evidence that if counsel had investigated Barrowman's and Swanson's story about blowing a tire Saturday night and their claim that Barrowman and Horton had no money to pay for it so Swanson had to leave them at the station for awhile, he would have discovered that the manager of the store where they allegedly bought the replacement tire stated that no tires were sold that day and that Barrowman and Horton had not been left there until Swanson could return with money to pay for the tire. *See id.,* Pat Fowler & Ron Palmer Aff. (Ex. 23A, 23B & 24 to petitioner's direct appeal brief). This would have impeached the testimony of both Barrowman and Swanson and would have shown that they collaborated to frame petitioner with the robbery and murder.

Petitioner also presented evidence showing that, had counsel investigated, he could have shown the jury that eleven minutes after Barrowman voluntarily appeared at the Seminole police station on July 7, claiming that petitioner confessed to the murder, Rozell voluntarily appeared at the Prague police station, also claiming that petitioner confessed to the murder. This, too, would have indicated that Barrowman and Rozell collaborated to frame petitioner. *See id.* (Ex. 27-29 to petitioner's direct appeal brief.)

-24-

The record demonstrates that if counsel had obtained and reviewed Barrowman's two prior recorded statements to police, he would have discovered significant internal inconsistencies in Barrowman's testimony. For example, Barrowman told police on July 9 that after petitioner dropped off Swanson at her house the night of the murder, petitioner drove to his apartment in Seminole, got out first, and went up to the apartment, then he got out and went in because he needed to go to the bathroom. Before they walked out, he said petitioner told him, "I done it, but don't tell Mike," and then told him she had put his gun under his pillow. *Id.* (Ex. 21 to petitioner's direct appeal brief). This statement conflicted with his trial testimony regarding the reasons he went into his apartment after the murder, the timing of petitioner's appearance in the apartment, and his statement that petitioner confessed to killing Opela after they returned to her home in Prague. In a subsequent statement to police later that day, Barrowman changed his story and stated that they went by the convenience store and bought beer, then they went by his apartment so he could get his work clothes, and petitioner came in and said she had put his gun back under his pillow. *See id.* , (Ex. 22 to petitioner's direct appeal brief).

Barrowman also told the police that he and Horton told Swanson about the gun on Saturday afternoon, July 4, and about their suspicions that petitioner had killed Opela with it, and gave her the gun to keep at that time. *See id.* Swanson

testified that they gave her the gun to keep either on Sunday or Monday evening (July 5 or 6), but that they did not give her any explanation about why they were concerned about the gun having been fired.    *See* R. Vol. VII, Tab 7 at 42.

Although trial counsel had only two and one-half months to prepare for this capital murder trial, he still had a duty to investigate the State witnesses' stories and to attempt to find any information that would impeach their testimony. Indeed, "we have pointed out that in a capital case, counsel's duty to investigate all reasonable lines of defense is strictly observed."    *Williamson v. Ward*  , 110 F.3d 1508, 1514 (10th Cir. 1997).  It is clear that he did not fulfill this duty. Petitioner alleges that before trial, when she was urging him to investigate several matters, counsel stated:  "What the state is paying me to defend you in this case is such a meager amount, I can't do very much for you and check out all this stuff you are telling me.  I have got to go to my office, and I've already gave [sic] you people more of my time than I should."  Petitioner's Br. at 15.

Counsel's overall performance was also seriously lacking.  In closing argument, he chose not to "belabor you good folks, and your time, with talking about the scores of minute inconsistencies that exist between the testimony of the State's witnesses"  *see* R. Vol. XI, Tab 11 at 75, and instead focused on what a "sloppy" and "completely bungled" job the State had done on the investigation. *Id.* at 75-76.  Counsel did point out the inconsistencies between Barrowman's and

Rozell's testimony regarding when Rozell allegedly first heard petitioner confess to killing Opela and as to when petitioner allegedly got the gun, *see id.* at 78, but he did not discuss any other inconsistencies in the testimonies of the State's witnesses, and the prosecutor pointed that out to the jury in his closing statement. Mostly, counsel simply impugned Rozell's poor moral character. This tactic was totally ineffective because, as the prosecutor demonstrated, in a mud-slinging immorality contest, petitioner provided the prosecution with ample ammunition. Reviewing counsel's overall performance in light of the avenues that he could have taken to present significant evidence that the State's key witnesses collaborated with one another and were lying about both their and petitioner's participation in the murder, we conclude that his performance was constitutionally ineffective.

**C. The duress defense.** Finally, petitioner argues that counsel was ineffective because he failed to request a duress defense. The district court determined that the evidence at trial did not support a claim of duress because, although Horton may have told her where to drive, petitioner was in control of the car at all times. *See* R. Vol. XIII, Doc. 30 at 20. The court also questioned whether the defense was available under Oklahoma law, although the State doesn't appear to have raised the issue.

Henson, Rozell, and petitioner all testified that Horton became physically violent the evening of the murder, and they all knew he was angry and serious. Petitioner testified that she had seen Horton be physically violent to both women and men before. Petitioner testified that after Horton got the gun and threatened to take Opela to Texas to kill him, she became afraid because she knew he was serious. *See id.* Vol. X, Tab 10 at 117-18, 206. When petitioner tried to take Opela home after they returned from Seminole the last time, she testified that Horton wouldn't let her:

> Q: What did he do to stop you?
> A: He pulled the gun out of his boot. . . . I can't say he pointed it at me, but he stuck it up in the air. . . . We was [sic] all standing right there together. I can't say whether he was pointing it at me, or Abe, or who.
> Q: And what did Mike do after he pulled the gun out?
> A: He said we were all going for a ride.
> . . . .
> A: He told me to go get my kids up out of bed, that we were going.
> . . . .
> Q: Why didn't you just refuse and say "I'm not going?"
> . . . .
> A: I knew better than to refuse to go.

*Id.* at 131-31. Petitioner testified that after Horton killed Opela, he said, "If I said anything it would be me, too." *Id.* at 138.

In Oklahoma, the defense of duress based on the doctrine of excuse is available for any crime and is a complete defense to guilt. *See Spunaugle v. Oklahoma*, 946 P.2d 246, 249-51 (Okla. Crim. App. 1997). It is an affirmative defense, and once sufficient evidence is presented that a defendant had a

-28-

reasonable belief of imminent death or great bodily harm unless he took the action that constituted the crime, the burden then shifts to the State to disprove duress beyond a reasonable doubt. *See id.* at 250. Here, petitioner testified that, under threat of being shot, she complied with Horton's instructions to drive Opela to a location where Horton shot Opela. That was sufficient to raise the defense to the kidnapping charge and to any accomplice murder theory (although petitioner was charged as the actual murderer and not as an accomplice). *Cf. Tully v. State*, 730 P.2d 1206, 1210-11 (Okla. Crim. App. 1986) (reversing convictions for felony murder, burglary, and accessory after the fact to murder because duress defense not allowed to defendants who testified they assisted murderer leave scene of murder and then burglarize house after threatened with baseball bat). The fact that petitioner was physically in control of the car does not negate the defense. Counsel was ineffective for having failed to request a duress defense instruction. The failure was so serious as to have prejudiced petitioner's defense as a matter of law.

For these reasons, we conclude that petitioner's petition for a writ of habeas corpus should be granted. The judgment of the United States District Court for the Eastern District of Oklahoma is **REVERSED** and **REMANDED**

-29-

with instructions to grant petitioner's habeas petition unless the state retries her [9]

within a reasonable time to be determined by the district court.

Entered for the Court


James E. Barrett
Senior Circuit Judge

---

[9] Respondent argues that "even if the jury believed the Petitioner's uncorroborated version of events, she is still guilty of Murder in the First Degree under the alternative theory of felony murder," *see* Respondent's Br. at 16. We disagree. The state district court dismissed the charge of felony murder after presentation of the case and refused to instruct the jury on felony murder because the evidence did not support such a conclusion. *See* R. Vol. XI, Tab 11 at 8-10. The state did not appeal from that ruling and, upon any retrial, may not try petitioner for felony murder. *See Smalis v. Pennsylvania*, 476 U.S. 140, 144 (1986) (holding that Double Jeopardy Clause is an absolute bar against a subsequent prosecution for the same offense following a determination by the trial judge that the evidence supporting the offense was insufficient as a matter of law).