20 S.W.3d 255 (2000)
In The Matter of R.D.B., a Juvenile.
No. 06-99-00077-CV.
Court of Appeals of Texas, Texarkana.
Submitted May 17, 2000.
Decided May 18, 2000.
*256 Jack Riley, Jackson, Riley & Walker, for appellant.
William L. Pattillo, Asst. County Atty., Frank H. Bass, Jr., Montgomery County Atty., Erik P. Berglund, Asst. County Atty., Conroe, for appellee.
Before CORNELIUS, C.J., GRANT and ROSS, JJ.

OPINION
Opinion by Justice ROSS.
In October 1996, R.D.B., age sixteen, was adjudicated by the juvenile court as having engaged in delinquent conduct by committing the felony offenses of aggravated assault, aggravated robbery, burglary of a habitation, and theft. The court then rendered a fifteen-year determinate sentence and ordered R.D.B. committed to the Texas Youth Commission, with possible transfer at age eighteen to the Institutional Division of the Texas Department of Criminal Justice (TDCJ). In April 1999, after R.D.B. attained the age of eighteen, he was returned to juvenile court for a release or transfer hearing pursuant to Tex. Fam.Code Ann. § 54.11 (Vernon 1996). At this hearing, the court ordered R.D.B. transferred from the Texas Youth Commission to the Institutional Division of the TDCJ to serve the completion of his fifteen-year determinate sentence. See Tex. Fam.Code Ann. § 54.11(i)(2).
R.D.B. appeals from this order of transfer and states his sole contention of error as follows:
Where the record is saturated with testimony from State's witnesses concerning the psychological condition of Juvenile-Appellant, where the record shows the Juvenile-Appellant suffered from a serious frontal lobe brain injury which may have affected his psychological condition, where counsel nevertheless failed to seek an independent psychiatric examination of the Juvenile-Appellant, and where said failure was not reasonably effective assistance, the Appellant was denied his constitutionally guaranteed right to effective assistance of counsel at a "Release or Transfer Hearing."
The State's only witness at this hearing was Leonard Cucolo, the program administrator for the Texas Youth Commission, Giddings Unit. Cucolo's qualifications, educational background, and professional experience do not appear in the record. Cucolo described some of the programs in which R.D.B. participated, but further testified that, despite all efforts, R.D.B. continued to be disruptive and assaultive, which precipitated this request for an early transfer to the Institutional Division of the TDCJ. The witness acknowledged that R.D.B. "has a brain injury as a result of a self-inflicted gunshot wound." He further stated that R.D.B. had been given medication *257 to control his seizure activity[1] and that a psychological evaluation conducted by Larry Reue (no qualifications, title, experience, or occupation were given) indicated that the brain injury may be contributing to R.D.B.'s delinquent behavior. Cucolo further testified, however, that it was Reue's conclusion that most of R.D.B.'s behavior was the result of anti-social values and characteristics rather than the result of an organic disorder. Cucolo said that it was Reue's opinion that R.D.B. is at a high risk to reoffend and that his amenability to further treatment is poor. On cross-examination, Cucolo stated that he was not aware of any connection between frontal lobe brain injuries and tendencies toward violence. He said that the only individuals at the Texas Youth Commission who addressed R.D.B.'s brain injury problems were Barbara Jones, the head nurse at the Giddings Unit, and several unnamed contract physicians. Cucolo further testified as follows on cross-examination:
This is an E-mail message that I received from Barbara Jones, who is the head nurse in our infirmary at Giddings. She indicated that she spoke to the neurologist on Friday, April 23rd, 1999. She stated that (R.D.B.'s) neurological exam was within normal limits. He did not recommend a repeat MRI. His EEG showed spikes which show brain irritability. However, they were not organized, thus he does not have the seizure activity that would occur should they be organized.
He further stated that he was not aware that R.D.B. had had a grand mal seizure and that he did not know the kind of treatment that would be provided by the TDCJ. Cucolo acknowledged that R.D.B. had an IQ of seventy-nine, admittedly "[b]orderline range of intelligence." He further admitted that the Crockett Unit of the Texas Youth Commission had programs for emotionally disturbed youth, but contended that R.D.B. was a "violent offender," and apparently was not eligible for that unit.
R.D.B.'s only witness was his mother, who testified regarding his brain injury and post-operative treatment. R.D.B. had to learn to speak again. He was placed in a rehabilitation program at a hospital for three months, as well as in other rehabilitation programs. She was dissatisfied with the Texas Youth Commission's handling of his problems. She testified that R.D.B. had had a grand mal seizure and several petit mal seizures[2] and was left with short-term memory loss, thought process dysfunction, and a loss of balance. She stated that R.D.B. was suffering from a seizure disorder from the brain injury. R.D.B. had been seen by a psychiatrist on the panel to treat children at the Texas Youth Commission, but was not permitted to be taken to that doctor's office. He was seen by a neurologist twenty months after his grand mal seizure, on April 15, 1999, just ten days before the release or transfer hearing. This neurologist increased R.D.B.'s dosage of Dilantin. She asked several times to have him transferred to other programs, but the Texas Youth Commission did not do so.
State's Exhibit 1 contains the report of Larry Reue, identified as an "M.Ed." The report states that R.D.B.'s frequent and deliberate anti-social behavior is more indicative of anti-social values than the result *258 of an organic disorder. The report does, however, acknowledge that R.D.B.'s difficulty in implementing cognitive skills into daily behavior may be affected by his traumatic head injury. The details and findings of this voluminous exhibit were discussed only very generally by the witness.
In presenting his argument regarding his alleged ineffective assistance of counsel, R.D.B. utilizes the wrong standard of review. He states in his brief that the release or transfer hearing is analogous to the punishment phase of a criminal trial, and that in reviewing an ineffective assistance claim at punishment, the appellate court is required to examine the totality of the representation received to determine whether it was "counsel reasonably likely to render and rendering reasonably effective assistance," citing Ex parte Williams, 753 S.W.2d 695, 698 (Tex.Crim. App.1988). In Williams, the court held that in claims of ineffective assistance of counsel at punishment in a noncapital case, the two-part standard of Strickland v. Washington[3] was not applicable, but rather whether the accused received counsel reasonably likely to render and rendering reasonably effective assistance, whose services are gauged by the totality of the representation afforded. Williams, 753 S.W.2d at 698, citing Ex parte Cruz, 739 S.W.2d 53 (Tex.Crim.App.1987), and Ex parte Duffy, 607 S.W.2d 507 (Tex.Crim. App.1980). However, in Hernandez v. State, 988 S.W.2d 770 (Tex.Crim.App. 1999), the Texas Court of Criminal Appeals specifically overruled Cruz and Duffy and held that the two-part Strickland test is applicable to all issues of alleged ineffective assistance, including noncapital sentencing proceedings. Therefore, the two-part Strickland test should be applied to these proceedings. See Garrett v. State, 998 S.W.2d 307, 312 (Tex.App.-Texarkana 1999, pet. ref'd, untimely filed).
A defendant has the burden on appeal of proving his claim of ineffective assistance of counsel, i.e, proving that counsel's representation fell below an objective standard of reasonableness based on prevailing norms and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is defined as a probability sufficient to undermine confidence in the outcome of the proceedings. Further, R.D.B.'s burden required him to establish his claims by a preponderance of the evidence. Jackson v. State, 973 S.W.2d 954, 956 (Tex.Crim.App. 1998).
In Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), the United States Supreme Court held that when a defendant in a criminal prosecution makes a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at the trial, the Constitution of the United States requires that the state provide access to a psychiatrist if the defendant cannot otherwise afford one:
We therefore hold that when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in the evaluation, preparation, and presentation of the defense.
470 U.S. at 83, 105 S.Ct. 1087.
In re J.E.H., 972 S.W.2d 928 (Tex.App.-Beaumont 1998, pet. denied), the Beaumont *259 Court of Appeals ruled that the constitutional requirement of a court-appointed psychiatric expert set forth in Ake v. Oklahoma is also applicable to the release or transfer hearings provided in Section 54.11 of the Family Code. The Beaumont court held that a child under the juvenile justice system is entitled to the same basic constitutional protections as an adult, and that the hearings conducted under this section of the Juvenile Justice Code were "roughly equivalent to the punishment phase of a criminal trial." Id. at 929. Section 54.11 provides, in pertinent part, that:
(d) At a hearing under this section the court may consider written reports from probation officers, professional court employees, or professional consultants, in addition to the testimony of witnesses. At least one day before the hearing, the court shall provide the attorney for the person to be transferred or released under supervision with access to all written matter to be considered by the court.
(e) At the hearing, the person to be transferred or released under supervision is entitled to an attorney, to examine all witnesses against him, to present evidence and oral argument, and to previous examination of all reports on and evaluations and examinations of or relating to him that may be used in the hearing.
....
(i) On conclusion of the hearing on a person who is referred for transfer under Section 61.079(a), Human Resources Code,[4] the court may order:
(1) the return of the person to the Texas Youth Commission; or
(2) the transfer of the person to the custody of the institutional division of the Texas Department of Criminal Justice for the completion of the person's sentence.
....
(k) In making a determination under this section, the court may consider the experiences and character of the person before and after commitment to the youth commission, the nature of the penal offense that the person was found to have committed and the manner in which the offense was committed, the abilities of the person to contribute to society, the protection of the victim of the offense or any member of the victim's family, the recommendations of the youth commission and prosecuting attorney, the best interests of the person, and any other factor relevant to the issue to be decided.
After completing its review of the statute, the Beaumont court held as follows:
Because of the hearing's impact upon a juvenile with respect to his or her punishment and the overall unfairness of the State's presentation of expert testimony when an indigent juvenile would not have the means to counter such evidence in the absence of the appointment of his or her own expert, we hold that the appointment of such an expert in connection with a release-transfer hearing is required by the Due Process Clause when an indigent juvenile makes the required showing to justify such an appointment.
J.E.H., 972 S.W.2d at 930.
In the context of an unconstitutional ineffective assistance of counsel challenge to *260 a criminal conviction, courts have been called on to determine whether the Strickland standards were upheld in situations where counsel allegedly failed to pursue a step allegedly necessary at trial where the defendant's mental capacity was at issue. See generally George L. Blum, Annotation, Adequacy of Defense Counsel's Representation of Criminal Client-Pretrial Conduct or Conduct at Unspecified Time Regarding Issues of Insanity, 72 A.L.R. 5th 109 (1999); George L. Blum, Annotation, Adequacy of Defense Counsel's Representation of Criminal Client-Issues of Incompetency, 70 A.L.R. 5th 1 (1999). In a number of cases, courts have found that counsel's failure amounted to unconstitutionally ineffective assistance.
In Bouchillon v. Collins, 907 F.2d 589 (5th Cir.1990), a habeas corpus case, Bouchillon sought to set aside a guilty plea on grounds that he was mentally incompetent at the time of the plea, and that his attorney's failure to investigate his competency prior to the plea constituted ineffective assistance. The record before the court of appeals showed that Bouchillon "in all probability" suffered from post-traumatic stress disorder both at the time of the alleged offense and at the time of his plea. At the evidentiary hearing, trial counsel admitted his knowledge of Bouchillon's past mental disorders, that Bouchillon had been institutionalized, and that he was on medication. Defense counsel performed no investigation into Bouchillon's mental health history because Bouchillon appeared to him to be rational, and because he did not feel an insanity defense would be successful. The Fifth Circuit held that "(i)n this case, counsel's lack of investigation after he had notice of Bouchillon's past institutionalization, fell below reasonable professional standards," and permitting Bouchillon to plead notwithstanding his incompetency sufficiently undermined confidence in the outcome to satisfy the prejudice element of ineffective assistance. Id. at 595-97.
In Williamson v. Ward, 110 F.3d 1508 (10th Cir.1997), the petitioner was sentenced to death on a conviction of capital murder, affirmed in Oklahoma state court. He sought relief by habeas corpus in federal court alleging, inter alia, ineffective assistance of trial counsel for failing to investigate and make use of his history of mental problems. Id. at 1512. The petitioner, both before and after the 1982 murder for which he was convicted, had an extensive history of mental problems. He had been admitted to several mental health institutions, and had been diagnosed with, among other things, bipolar disorder, alcoholism, drug dependence, and paranoid personality disorder. Id. at 1515. At one time, a mental health professional had determined that the petitioner was mentally incompetent to stand trial on a bad check charge. Another individual had determined at a later date that the petitioner had become competent, and the petitioner was tried, convicted, and confined on that charge. Trial counsel relied solely on this second opinion, ignoring all other information regarding the petitioner's mental state. Id. Counsel's use of only the second opinion from the bad check case, and his failure to investigate or utilize all information of the petitioner's history of mental illness, and his failure to request a competency hearing, were held to constitute ineffective assistance. Id. at 1516-18.
Moore v. Johnson, 194 F.3d 586 (5th Cir.1999), was a habeas corpus review of a capital sentence imposed by the State of Texas. One issue raised was the alleged ineffective assistance of counsel at the punishment phase of the trial. The Fifth Circuit relied on the Strickland standard: defendant must show that counsel's performance was deficient, i.e., that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment, and further must demonstrate prejudice to the defendant from such deficiencies. Id. at 591. One of the claims was that trial counsel failed to investigate, develop, or present mitigating evidence at punishment, including *261 evidence of organic brain damage, which would have placed petitioner in the mentally retarded classification. Id. at 614-15. The Fifth Circuit found there to be no conceivable strategy for not investigating and presenting such evidence, id. at 618-19, and that counsel's failure was prejudicial to petitioner. Id. at 619.
All of these cases were decided under the Strickland standard and are instructive in applying that standard to R.D.B.'s ineffective assistance claim. The State's evidence in this case consisted solely of a voluminous written report and one witness, whose qualifications were not in the record. The witness testified by hearsay of the conclusions of others who determined that R.D.B.'s frontal lobe brain injury did not produce his anti-social and disruptive behavior. While Cucolo may have been a competent and qualified expert witness, his credentials do not appear in the record of this case. Cucolo read the conclusion of Reue (whose only qualification shown is that he has an "M.Ed.") that R.D.B.'s problem behavior was primarily the result of anti-social values rather than an organic injury. The primary health care person with personal knowledge of R.D.B.'s condition, the head nurse at the Giddings Unit, was not called as a witness. However, when asked if R.D.B. had been examined by a neurologist, Cucolo read an e-mail message addressed to head nurse Barbara Jones from an unnamed physician regarding R.D.B.'s condition. Although the testimony indicated that R.D.B. had been examined by one of a panel of mental health experts, no member of this panel was called. R.D.B.'s only witness was his mother, a nurse's aide, who explained, as best as she could, the nature of R.D.B.'s brain injury, his treatment, and her unsuccessful attempts to obtain what she viewed as proper treatment at the Texas Youth Commission. Cucolo was unable to testify as to the treatment R.D.B. would receive if transferred to the Institutional Division of the TDCJ. Defense counsel made disparaging comments regarding the "rehabilitation" philosophy at the TDCJ. At closing argument, the assistant district attorney called the court's attention to one small portion of this voluminous report which concluded that R.D.B.'s behavioral problems were not primarily the result of the organic disorder and then added his own analysis: "I don't think a head injury causes people to attack teachers."
R.D.B. put on no professional evidence of any kind. The appointment of a psychiatrist or other mental health professional would have accomplished at least two things: 1) it would have required the State to at least have its own mental health professionals to testify in person; and 2) it would have enabled R.D.B.'s counsel to better test the conclusions contained in the report. It is also possible that R.D.B.'s own expert may have reached an opposite conclusion, i.e., that R.D.B.'s behavioral problems were, in fact, a product of his frontal lobe brain injury.
Under Strickland and the cases cited here, counsel has a duty to investigate such plainly evident background of mental health problems of his client. In the face of such an unfavorable report, counsel was clearly under a duty to seek, in conjunction with his obligation to provide the best defense possible for his client, the court-appointed assistance of a mental health professional, to which he was entitled. His failure to do so clearly prejudiced R.D.B. and undermines this Court's confidence in the outcome of the proceedings.
We hold that R.D.B.'s issue on appeal is well taken. The judgment of the trial court is reversed, and the case is remanded for a new hearing under Section 54.11 of the Family Code.
NOTES
[1] The record indicates R.D.B. was administered the drug referred to as "Dilantin"-a trademark name for "phenytoin"-defined as "[a]n anticonvulsant and cardiac depressant... occurring as a white powder; used in the treatment of all forms of epilepsy except petit mal and as an antiarrhythmic, administered orally." Dorland's Illustrated Medical Dictionary 473, 1279 (27th ed.1988).
[2] Grand mal-epilepsy-is frequently preceded by an aura, in which a sudden loss of consciousness is immediately followed by generalized convulsions. Petit mal is epilepsy in which there is a sudden momentary loss of consciousness with only minor myoclonic jerks, seen especially in children. Dorland's Illustrated Medical Dictionary 568 (27th ed.1988).
[3] Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984), reads in pertinent part as follows:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.
[4] Tex. Hum. Res.Code Ann. § 61.079 (Vernon Supp.2000) provides in relevant part:

(a) After a child sentenced to commitment [to the Texas Youth Commission with a possible transfer to the institutional division of the Texas Department of Criminal Justice] becomes 16 years of age but before the child becomes 21 years of age, the commission may refer the child to the juvenile court that entered the order of commitment for approval of the child's transfer to the institutional division of the Texas Department of Criminal Justice if:
(1) the child has not completed the sentence; and
(2) the child's conduct ... indicates that the welfare of the community requires the transfer.