

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-17-00007-CV

IN THE MATTER OF T.C., A
JUVENILE

----------

## FROM THE 355TH DISTRICT COURT OF HOOD COUNTY
## TRIAL COURT NO. J00378

----------

## MEMORANDUM OPINION[1]

----------

On October 23, 2014, the trial court adjudicated then fifteen-year-old Appellant T.C. as having engaged in delinquent conduct by committing the offense of indecency with a child by contact. *See* Tex. Penal Code Ann. § 21.11(a)(1) (West Supp. 2017). A jury heard evidence concerning what

---

[1]*See* Tex. R. App. P. 47.4.

disposition should be made and sentenced him to twenty years in the Texas Juvenile Justice Department (TJJD). The trial court, accordingly, committed him to the TJJD's care, custody, and control for a determinate sentence of twenty years, with a possible transfer to the Institutional Division of the Texas Department of Criminal Justice (TDCJ). A little more than two years later, on November 2, 2016, the TJJD's executive director sent a referral to the trial court requesting it to conduct a hearing under family code section 54.11 to determine whether T.C. should be transferred to the TDCJ. *See* Tex. Fam. Code Ann. § 54.11 (West Supp. 2017) (governing juvenile court's decision to transfer juvenile offender); Tex. Hum. Res. Code Ann. § 244.014 (West Supp. 2017) (authorizing the TJJD to refer juvenile offender between age 16 and 19 for transfer to the TDCJ). After conducting a section-54.11 hearing on December 29, 2016, the trial court ordered T.C. transferred to the TDCJ to serve the remainder of his twenty-year sentence.

In a single issue, T.C. contends he received ineffective assistance of counsel at the transfer hearing in violation of the federal and state constitutions because his appointed trial counsel failed to request an independent medical examination to determine the nature of the underlying psychological and psychiatric issues that caused his problematic behavior at the TJJD prior to the hearing. We affirm.

2

## I. STANDARD OF REVIEW

We review a claim of ineffective assistance of counsel under the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). *See Hernandez v. State*, 988 S.W.2d 770, 770 (Tex. Crim. App. 1999) (applying *Strickland* standard to claim of ineffective assistance at noncapital sentencing proceedings); *see also In re K.H.*, No. 12-01-00342-CV, 2003 WL 744067, at *4–5 (Tex. App.—Tyler Mar. 5, 2003, no pet.) (mem. op.) (applying *Strickland* standard to claim of ineffective assistance during section-54.11 transfer proceeding); *In re R.D.B.*, 20 S.W.3d 255, 256, 258 (Tex. App.—Texarkana 2000, no pet.) (same). To establish ineffective assistance of counsel, T.C. must show by a preponderance of the evidence that his counsel's representation was deficient and that the deficiency prejudiced the defense. *See Strickland*, 466 U.S. at 687; *Nava v. State*, 415 S.W.3d 289, 307 (Tex. Crim. App. 2013). An ineffective-assistance claim must be "firmly founded in the record," and "the record must affirmatively demonstrate" the meritorious nature of the claim. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). An appellant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other prong. *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009).

Direct appeal is usually an inadequate vehicle for raising an ineffective-assistance-of-counsel claim because the record is generally undeveloped. *Menefield v. State*, 363 S.W.3d 591, 592–93 (Tex. Crim. App. 2012); *Thompson*,

3

9 S.W.3d at 813–14. In evaluating the effectiveness of counsel under the deficient-performance prong, we look to the totality of the representation and the particular circumstances of each case. *Thompson*, 9 S.W.3d at 813. The issue is whether counsel's assistance was reasonable under all of the circumstances and the prevailing professional norms at the time of the alleged error. *See Strickland*, 466 U.S. at 688–89; *Nava*, 415 S.W.3d at 307. Review of counsel's representation is highly deferential, and the reviewing court indulges a strong presumption that counsel's conduct was not deficient. *Nava*, 415 S.W.3d at 307–08.

It is not appropriate for an appellate court to simply infer ineffective assistance based upon unclear portions of the record or when counsel's reasons for failing to do something do not appear in the record. *Menefield*, 363 S.W.3d at 593; *Mata v. State*, 226 S.W.3d 425, 432 (Tex. Crim. App. 2007). Trial counsel "should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective." *Menefield*, 363 S.W.3d at 593. If trial counsel is not given that opportunity, we should not conclude that counsel's performance was deficient unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *Nava*, 415 S.W.3d at 308.

## II. TRANSFER HEARING

T.C.'s transfer hearing took place on December 29, 2016, and the evidence presented at the hearing consisted of (1) the testimony of the TJJD's court liaison, Leonard Cucolo; (2) Cucolo's written report recommending that the

4

court transfer T.C. to the TDCJ; (3) the testimony of T.C.; and (4) a stipulation to a summary of the testimony that T.C.'s mother, grandmother, and grandfather—all of whom were in the courtroom—would give if they were called to testify.

### A. CUCOLO'S TESTIMONY

Cucolo testified that he had worked in various roles for the TJJD for twenty-seven years. He stated that in his current position as the TJJD's court liaison, he represents the TJJD in a yearly average of sixty to seventy hearings that involve juvenile offenders who have been sentenced and subsequently referred back to the sentencing court for a disposition of adult parole or transfer to adult prison, and he further said that at those hearings, he provides the TJJD's recommended disposition to the court. Cucolo confirmed he was familiar with T.C., as well as with the TJJD's efforts to rehabilitate him from the time he was placed into its custody on October 23, 2014.

Cucolo testified that upon entering the TJJD's custody, T.C. was placed in an orientation and assessment unit to undergo a battery of evaluations, including medical, psychiatric, and educational to determine what T.C.'s particular treatment needs were. Cucolo stated that based on those evaluations, it was determined that T.C. had a high need for the TJJD's sexual-behavior treatment program, and T.C. was thus placed in that program. Cucolo averred that the TJJD provided T.C. with a variety of services, including the sexual-behavior treatment program, psychiatric services, and an anger-management program. Cucolo further testified that T.C. had been with the TJJD for more than twenty-

5

four months and that over that time, T.C. had done poorly in most of the areas in which he had been involved. Specifically, Cucolo stated that T.C. had more than 200 documented incidents of misconduct and that many of those constituted major rule violations.[2] Cucolo also said that T.C. had failed his anger-management program and had refused to participate in, and accept his medication during, his sexual-behavior treatment program.

In addition, Cucolo testified that T.C. continued to have difficulty accepting responsibility for his offense. Cucolo indicated that the TJJD had performed a psychological examination of T.C. for the purpose of the hearing and to help the TJJD in forming a recommendation to the court. That examination, according to Cucolo, showed that there had not been any significant change in T.C.'s risk of committing another sexual offense. Cucolo also said that in addition, T.C.'s problematic behavior while confined in the TJJD's highly structured setting during the prior twenty-four months demonstrated that he was not amenable to the treatments the TJJD had offered and provided to him. Cucolo stated that when a juvenile who has been committed to the TJJD repeatedly violates the rules and does not participate in the treatment programs offered to him, that behavior has a negative impact on other juveniles who are in the TJJD's treatment programs and

---

[2]Cucolo stated that major rule violations "are basically new offenses that a youth can engage in while confined within our facility" and that minor rule violations were "violations such as refusing to follow staff instructions, not participating in the program, things like that."

reduces their chance at a positive outcome. Ultimately, Cucolo testified that the TJJD's recommendation was that the trial court transfer T.C. to the TDCJ

## B. CUCOLO'S WRITTEN REPORT

Cucolo's written report indicated that a juvenile's rehabilitative treatment progress while in the TJJD is assessed monthly in what are called "stage assessments." Those assessments, according to Cucolo's report, "evaluate[] a youth's progress in reducing risk factors for recidivism and increasing protective factors related to positive community reintegration." The stages rank from the lowest, entry-level stage called "Stage 1," to what is called the "Youth Empowerment Status," where a juvenile is actively preparing to be released back into the community. The report stated that T.C. had entered the TJJD at a Stage 1 level and had never promoted to a higher stage during his two years at the TJJD. The report further stated that the primary reason why T.C. had not been able to achieve a higher stage was due to his behavior, which had resulted in his being removed from his treatment programs. With respect to T.C.'s behavior, the report indicated that T.C. had 248 incidents on his record, ranging from loud and disruptive behaviors and horse playing to refusing to follow staff instructions and using profanity or being disrespectful. The report further stated that T.C. had numerous major violations ranging from property destruction and tattooing to sexual misconduct and physical aggression.

Cucolo's report also stated that Amanda Richter, a Doctor of Psychology, had completed a psychological evaluation of T.C. on July 15, 2016. Cucolo

7

quoted Dr. Richter's assessment as stating that T.C. had not been able to attain any assessment stage beyond Stage 1. He further quoted Dr. Richter's assessment as stating that T.C. "ha[d] received psychiatric services, sexual behavior treatment, and aggression replacement training in addition to counseling with his case manager." According to Dr. Richter, despite these interventions, T.C. had "continued to show resistance in treatment and significant behavioral concerns." Additionally, Dr. Richter stated that T.C. had "made no improvement in reducing his risk for sexual re-offending while in [the] TJJD." Cucolo's report further stated that T.C.'s medications, Strattera and Sertraline, had been discontinued due to his "refusing his medication again."

## C. T.C.'S TESTIMONY

T.C. testified that he had attended educational classes while in the TJJD. Specifically, he had attended science, algebra, reading, and world geography classes; he had completed a welding class; and he had taken photo-shop and "GD-prep" classes. T.C. agreed with Cucolo's assessment in his written report that T.C. was at a sixth-grade reading level. T.C. also stated that he was improving in his math classes.

T.C. also stated that he "get[s] to meet with a psychiatrist or psychologist" while in the TJJD and that they teach him ways to control his emotions and prescribe him medications, including Trazadone, Geodon, melatonin, and Zoloft. T.C. said, however, that those medications made him sick, so he stopped taking them. T.C. averred that he had had problems with depression while in the TJJD

8

and that he had to be placed on suicide watch. With regard to his being placed on suicide watch, T.C. testified that he got "tired of dealing with the same thing every day," so he would say something to somebody about suicide. T.C. stated that when that happened, somebody had to watch him and that every ten minutes, that person had to write down what T.C. was feeling. T.C. said that he had been on that kind of watch on and off about ten times during the prior twenty-four months.

With regard to his anger-management program, T.C. stated that he had to take that program several times. The first time he took it, he was kicked out because he got in a fight. He failed to complete the anger-management program the second time he took it because he got kicked out of his sex-offender treatment program and was consequently removed out of the dorm where the anger-management classes were given. T.C. said he passed his anger-management program the third time he took it. T.C. stated that he was the smallest person in his unit and that he did not want to be transferred to an adult facility. He said he believed that if he were given more time in the TJJD, he could do better than he had previously and that he could successfully complete more of the treatment programs.

On cross-examination, T.C. stated that he would act differently if returned to the TJJD by listening to staff, doing his best in completing his treatment programs, and not trying to handle his problems on his own. However, he acknowledged that as recently as December 12, 2016—only a little more than

9

two weeks prior to the hearing—he had assaulted a female guard at the TJJD. He stated that he had been sent to security and a guard attempted to handcuff him, but he did not allow her to do so. T.C. acknowledged that it was the guard's job to decide whether to handcuff him and that it was his place to comply with her decision. He also acknowledged that he had had two years to figure out that he was supposed to comply with the guards' instructions and that the December 12, 2016 incident showed that he still had not learned to do so. T.C. stated that his two-week stay in the county jail pending his transfer hearing had changed his attitude about who is in charge and what he is supposed to do at the TJJD.

T.C. also acknowledged that he had 248 disciplinary infractions during his twenty-four months at the TJJD. He stated that due to his behavior, he was unable to complete his sex-offender treatment program. T.C. said that he had known the consequences of not completing his treatment program at the TJJD, but he did not realize how serious it was until his transfer hearing. Yet he also stated that there were other juveniles in the TJJD who, like him, were serving determinate sentences; that he had talked with them and they with him; and that everyone knew that if they did not comply with the TJJD's requirements, then they would be transferred to the TDCJ.

In addition, T.C. testified that his mother, grandmother, and grandfather were in the courtroom to support him. He stated that he was able to talk to his family on the phone and that they were able to visit him in the TJJD. T.C. also

10

testified that if he was transferred to the TDCJ, it would be more difficult for his family to visit him. T.C. stated that he wanted to be returned to the TJJD.

### D. STIPULATED SUMMARY OF T.C.'S FAMILY'S TESTIMONY

Following T.C.'s testimony, his attorney told the trial court that he would call T.C.'s family to testify but that "they would just say that they think he's too immature to be sent to the adult facility. That's a summary of their testimony." T.C.'s counsel further stated that his family's preference is that T.C. "stay in the Waco area."[3] The trial court accepted counsel's statements as a summary of what T.C.'s family would otherwise testify to.

### III. APPLICATION

In arguing that his trial counsel's failure to request an independent medical examination amounted to ineffective assistance, T.C. principally relies upon the Texarkana court of appeals' decision in *R.D.B.*, in which it held, under the facts of that case, that the failure of the appellant's trial counsel to seek the court-appointed assistance of a mental-health professional in connection with the appellant's section-54.11 transfer hearing constituted ineffective assistance of counsel. *See* 20 S.W.3d at 261. T.C. argues that the facts of this case are so similar to the facts in *R.D.B.* as to compel the same result here. We conclude, however, that T.C.'s reliance on *R.D.B.* is misplaced.

---

[3]The record reflects that the TJJD facility in which T.C. had been placed was in McLennan County.

## A. *IN RE R.D.B.*

*R.D.B.* involved a section-54.11 transfer hearing of R.D.B., a juvenile who had previously been adjudicated delinquent and sentenced to a determinate sentence of fifteen years in the Texas Youth Commission (TYC). *Id.* at 256. As in T.C.'s case here, the State's only witness in *R.D.B.* was Cucolo. *Id.* Cucolo testified that R.D.B. had participated in some treatment programs while in the TYC but nevertheless continued to be disruptive and assaultive, which resulted in his referral to the trial court to be transferred to the TDCJ. *Id.* Importantly, Cucolo also testified that R.D.B. "ha[d] a brain injury as a result of a self-inflicted gunshot wound"; that R.D.B. had been given medication to control his seizure activity; that a psychological evaluation of R.D.B. had been conducted by Larry Reue (a person whose qualifications, title, experience, and occupation did not appear in the record); and that Reue indicated that R.D.B.'s brain injury "may be contributing to [his] delinquent behavior." *Id.* at 256–57. Cucolo stated, however, that Reue's ultimate conclusion was that "most of R.D.B.'s behavior was the result of anti-social values and characteristics rather than the result of an organic disorder." *Id.* at 257.

R.D.B.'s mother also testified, and she stated that following his brain injury and operation, he had to learn to speak again and was placed in multiple rehabilitation programs. *Id.* She also testified that R.D.B. had a grand mal seizure and several petit mal seizures and had short-term memory loss, thought-process dysfunction, and a loss of balance. *Id.* She further testified that R.D.B.

12

suffered from a seizure disorder from his brain injury. *Id.* Additionally, a written report from Reue acknowledged that "R.D.B.'s difficulty in implementing cognitive skills into daily behavior may be affected by his traumatic head injury." *Id.* at 258.

R.D.B. argued that his counsel's failure to seek an independent psychiatric examination constituted ineffective assistance of counsel. *Id.* at 256. Our sister court began its analysis by concluding that the Supreme Court's holding in *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985), applies to a section-54.11 transfer hearing. *R.D.B.*, 20 S.W.3d at 258–59. Under *Ake*,

> when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in the evaluation, preparation, and presentation of the defense.

*Ake*, 470 U.S. at 83. The court of appeals then examined the record and concluded that R.D.B.'s counsel had

> a duty to investigate such plainly evident background of mental health problems of [R.D.B.]. In the face of such an unfavorable report, counsel was clearly under a duty to seek, in conjunction with his obligation to provide the best defense possible for his client, the court-appointed assistance of a mental health professional, to which he was entitled. His failure to do so clearly prejudiced R.D.B. and undermines this Court's confidence in the outcome of the proceedings.

*R.D.B.*, 20 S.W.3d at 261.

### B. T.C. Failed to Establish He Was Entitled To An Appointed Mental-Health Expert

The State observes that T.C.'s argument that his trial counsel rendered ineffective assistance by failing to request an independent medical examination

13

assumes that *Ake* is applicable to a section-54.11 transfer proceeding. And the State further asserts that unlike our sister court in *R.D.B.*, this court has never held that *Ake* applies to a section-54.11 transfer proceeding. For purposes of our analysis here, we assume, without deciding, that *Ake* applies to a section-54.11 transfer proceeding. *See In re A.A.L.*, No. 14-06-00027-CV, 2007 WL 704958, at *1 (Tex. App.—Houston [14th Dist.] Mar. 8, 2007, no pet.) (mem. op.) ("For the purposes of our analysis, we presume, without deciding, that the *Ake* analysis applies to a transfer hearing under section 54.11 of the Texas Family Code.").

Under *Ake*, to be entitled to the appointment of an expert, a defendant must make a threshold showing that he has a particularized need for such an expert to address a significant issue at trial. *See Griffith v. State*, 983 S.W.2d 282, 286–87 (Tex. Crim. App. 1998); *A.A.L.*, 2007 WL 704958, at *2; *see also Maldonado v. State*, No. 14-03-00074-CR, 2004 WL 234377, at *2 (Tex. App.—Houston [14th Dist.] Feb. 10, 2004, pet. ref'd) (mem. op., not designated for publication) (holding appellant was not entitled to appointment of mental-health expert under *Ake* because he failed to demonstrate his sanity "was likely to be a significant factor at trial"). That showing was made in *R.D.B.*, where there was evidence indicating that R.D.B.'s mental health was likely to be a significant factor at trial: (1) R.D.B. had suffered an organic brain injury resulting from a self-inflicted gunshot wound; (2) R.D.B. had been placed on medication to control a seizure disorder that resulted from the brain injury; and (3) a psychological evaluation of R.D.B. had indicated that R.D.B.'s underlying brain injury may have

14

contributed to his delinquent behavior. *R.D.B.*, 20 S.W.3d at 256–58; *see Maldonado*, 2004 WL 234377, at *2. Based on the record before us, none of these things is true of T.C.'s case.

Having reviewed the record, we conclude that, assuming *Ake* applies to a section-54.11 transfer hearing, T.C. did not meet his threshold burden under *Ake* to show that his mental health was likely to be a significant issue at his transfer hearing such that he was entitled to the appointment of a mental-health expert to perform an independent psychological or psychiatric examination on him. *See Maldonado*, 2004 WL 234377, at *2 (concluding appellant was not entitled to appointment of mental health expert where he failed to demonstrate "his sanity was likely to be a significant factor at trial"). There was no evidence and no contention at trial that any mental-health condition caused T.C.'s behavioral problems or repeated failures in the TJJD. Consequently, on the record before us, T.C. has failed to overcome the strong presumption that his trial counsel's conduct was not deficient. *See Nava*, 415 S.W.3d at 307–08; *Maldonado*, 2004 WL 234377, at *2 (holding counsel's performance was not deficient for failing to request the appointment of a mental health expert where appellant was not entitled such an expert under *Ake*). Additionally, we note that our record does not show T.C.'s trial counsel was ever afforded an opportunity to explain his trial strategy or his reasons for not requesting an expert to perform an independent psychological or psychiatric examination. *See Menefield*, 363 S.W.3d at 593; *Mata*, 226 S.W.3d at 432.

15

Because T.C. has not shown that his trial counsel's representation was deficient, we overrule his sole issue. *See Strickland*, 466 U.S. at 687; *Nava*, 415 S.W.3d at 307; *Williams*, 301 S.W.3d at 687.

## IV. CONCLUSION

Having overruled T.C.'s sole issue, we affirm the trial court's transfer order. *See* Tex. R. App. P. 43.2(a).

/s/ Lee Gabriel

LEE GABRIEL
JUSTICE

PANEL: WALKER, MEIER, and GABRIEL, JJ.

DELIVERED: January 4, 2018

16